---

IN RE K.H. ET AL.

[Cite as *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825.]

(No. 2007-2454—Submitted June 24, 2008—Decided September 30, 2008.)

---

O'CONNOR, J.

{¶ 1} Appellants, Todd H. and Sarah H., appeal from the judgment of the Sixth District Court of Appeals that affirmed the order of the Lucas County Court of Common Pleas, Juvenile Division, terminating their parental rights to their daughter, K.H., who was born in 2002, and son, J.H., who was born in 2004.

{¶ 2} For the following reasons, we affirm.

## RELEVANT BACKGROUND

{¶ 3} On March 4, 2005, the juvenile court granted the ex parte request of Lucas County Children Services ("LCCS") for emergency shelter care of J.H., then four months old, after he was diagnosed with a subdural hematoma consistent with shaken-baby syndrome. LCCS's complaint in dependency, neglect, and abuse, filed on March 7, 2005, averred that J.H. was dirty when emergency medical workers transported him to the hospital.

{¶ 4} LCCS's complaint sought temporary-custody orders for J.H., K.H., and J.E.[1] All three children were removed from appellants' home in early March and placed in the temporary custody of relatives or LCCS. K.H. and J.E. were later found to be dependent, and J.H. was found to be dependent and abused; appellants consented to the findings of dependency. None of the three children resided in appellants' home after the temporary-custody arrangements of March 2005 were established.

{¶ 5} LCCS also alleged in the complaint that Todd was a registered sex offender. After temporary-custody arrangements were made, LCCS continued to investigate the family. Based on that investigation, LCCS filed a motion for permanent custody on May 2, 2006.

{¶ 6} During its investigation, LCCS found that in March 1991, Todd was indicted on 14 charges for offenses he committed against two young boys, aged five and seven years. Those charges included multiple counts of gross sexual imposition, felonious sexual penetration, and illegal use of a minor in nudity-oriented materials.

{¶ 7} In a "victim impact letter" that Todd wrote in 2006 as part of a "relapse prevention plan," Todd explained in great detail that he had chosen the victims because their families trusted him; that he "groomed" the boys he targeted for abuse by buying them presents, spending time with them, and telling them how much he loved them; and that he persuaded the boys to refrain from telling anyone about the acts. When the abuse was discovered, Todd denied that it had occurred and accused the boys and their mothers of lying.

{¶ 8} Todd pleaded guilty to two counts of gross sexual imposition and one count of illegal use of a minor in nudity-oriented materials and received an aggregate term of four to 15 years' incarceration. However, Todd's motion for shock probation was granted, and he was released from prison in January 1998. The conditions of his five-year probation included participating in a sexual-offender program, having no contact with his victims, and having no unsupervised conduct with minors. In addition, Todd was classified as a sexually oriented offender.[2]

---

1. J.E. is Sarah's son from a prior relationship. In November 2005, the juvenile court granted legal custody of J.E. to his biological father. That decision is not at issue in this appeal. Facts regarding J.E. are discussed only insofar as they are relevant to the determinations involving J.H. and K.H.

2. Todd was initially classified as a sexual predator, but that designation was reversed on appeal due to a procedural error in conducting the classification hearing. Although Todd was reclassified as a sexually oriented offender rather than as a predator, we note that his reclassification was the result of a pure legal question and not due to any error on the merits of the trial court's decision.

{¶ 9} While on probation, Todd was required to attend sexual-offender treatment ("SOT"). Although Todd's probation was terminated as "successfully completed" in January 2003, there was ample evidence that his success was purely administrative. Indeed, the evidence suggests strongly that Todd's probation was terminated as "successful" merely because he technically had met all the conditions of probation set forth by the judge by attending group therapy sessions and paying court costs. Todd's SOT, however, had been terminated as unsuccessful with an indication that his unwillingness or inability to benefit from therapy should be strongly considered by the court. Nancy Larson, Todd's treating therapist for the five years he was on probation and an expert in SOT, testified at the permanent-custody hearing that rather than internalizing any therapeutic benefit from SOT, Todd refused to accept full responsibility for his actions and minimized his offenses, so that he was in a "pre-instructional therapy group" commonly called the "Deniers Group" during most of his probation and he never progressed into a full-fledged therapy group.

{¶ 10} In light of Todd's history, LCCS's case plan for reunification of the family addressed Todd's pedophilia and his history of sexually abusing children. LCCS's initial case plan, proposed on March 31, 2005, stated that Todd was a registered sex offender who had not completed treatment and did not "appear to have any remorse or thought for the crime he committed against a minor child." It also stated that "Sarah doesn't appear to have any concerns for her children or understand the seriousness of Todd's crime." The plan required Todd to undergo SOT and required Todd and Sarah to learn the indicators and triggers of sexual abuse.

{¶ 11} An amended case plan also stated that "[Todd] will learn the dynamics of sexual offending and he will not abuse any other individual. He will learn to show empathy for victims, and he will work through his issues successfully. [Todd] will complete SOT services with Unison Behavioral Health. *He will follow all treatment recommendations. He will demonstrate progress.*" (Emphasis added.)

{¶ 12} Todd at one point objected to SOT as "unnecessarily burdensome" but withdrew his opposition before the juvenile court ruled on his objection. The case plan was later approved by the juvenile court.

{¶ 13} A guardian ad litem ("GAL") appointed to protect the children's interests in the juvenile court proceedings recommended that K.H.'s and J.H.'s temporary-custody arrangements continue. The GAL expressed concern for the children's physical safety because of the serious nature of J.H.'s injuries and the inability to identify the perpetrator.[3] He also expressed significant concern about

---

3. Despite extensive investigation, the person responsible for J.H.'s injuries has never been identified.

the ongoing risk of sexual abuse. The GAL reported that Todd continued "to display denial of his issues with sexual abuse" and concluded that the children "would not be safe in the * * * household at this time. Only time will tell if [Todd and Sarah] can show service providers that they have internalized the risks and concerns and can reduce the risks in their home so that it is a safe environment for [their children]."

{¶ 14} However, serious questions continued about any meaningful progress in appellants' therapy and education. Moreover, the juvenile court was forced to remove K.H. from her temporary placement in her paternal grandparents' custody after LCCS alleged that K.H.'s paternal grandmother left K.H. alone in the care of Todd and the paternal grandfather. The paternal grandmother had been required to supervise any contact between K.H. and Todd or the paternal grandfather, who had been accused of sexually molesting family members. LCCS was awarded temporary custody of K.H.

{¶ 15} LCCS later moved to obtain permanent custody because J.H.'s abuser remained unidentified, there were ongoing concerns about Todd's pedophilia and his lack of meaningful treatment, and Todd and Sarah would not separate. In doing so, LCCS maintained that the home was too unsafe to allow for return of the children. LCCS also alleged that in December 2005, during a supervised visit, Todd had K.H. straddling his lap in a manner deemed inappropriate given his history of sexually abusing children. At the permanent-custody hearing, William Emahiser, an expert in SOT who treated both Sarah and Todd in conjunction with their case plans, described that incident as a very significant problem in light of Todd's previous "grooming behavior." Emahiser testified that Todd should have known better because he was at the end of his therapy at that time. As Emahiser described it, the behavior was akin to sending "an alcoholic to go work as a bartender."

{¶ 16} Given the lack of progress in SOT, in July 2006, the GAL recommended that LCCS be granted permanent custody of K.H. and J.H. The GAL's report stated that Todd had "consistently downplayed" his sexual-abuse convictions and need for treatment, that his relapse-prevention plan was largely inadequate, that he had not successfully completed his sexual-offender treatment while on probation, and that he "continues to engage in manipulative behavior, show poor insight and has not demonstrated the core changes necessary to show he has made the progress he needs to make to be with the children." The GAL also asserted that Sarah had not demonstrated the ability to protect the children or to be an adequate part of the relapse-prevention plan, and that she could not overcome Todd's manipulative behavior.

{¶ 17} Larson testified at the permanent-custody hearing that Todd is a pedophile, i.e., that sex with minor children is "the most gratifying sexual

experience" possible for him and that a related fixation causes him to seek sexual experiences with minor children. She testified that pedophilia does not go away and that to be rehabilitated, a pedophile must accept pedophilia as a part of his personality and commit to not reoffending. The evidence suggests that Todd did not commit to the fundamental aspects of treatment.

{¶ 18} Larson testified that not only did Todd not complete treatment, he never truly "even began treatment" because "the necessary attitudes were not there at the beginning and they were not there five years later." She described his participation in therapy as superficial and considered Todd's therapy a wasted effort because he refused "to make efforts or make progress in five years" of SOT. Documentary evidence introduced by LCCS during the permanent-custody hearing indicated that Larson found that Todd was a pedophile and a predator, that "he was in denial of both these facts throughout his entire time on probation," and that he was "an extremely high risk to reoffend and that his time on probation had done nothing to lower that risk." Other evidence suggested that Larson had also found Todd to be at "medium/high risk" to reoffend and that he was unable "to develop insight or adequate controls of his behavior."

{¶ 19} Emahiser's testimony during the permanent-custody hearing was somewhat more favorable to appellants than Larson's. His testimony, however, was not entirely positive; at best it was equivocal.

{¶ 20} Emahiser testified that Todd had adequately demonstrated that he understood concepts about sexual abuse, and that he wrote an "adequate" victim-impact letter as part of his relapse-prevention plan, accepted responsibility for his offenses, and made progress by the end of the therapy program. Todd was assessed as a medium-low risk to reoffend based on a standard assessment test, but, significantly, Emahiser testified that Todd struggled with the concept of empathy for his victims. Emahiser also testified that access to children would increase Todd's risk of reoffending, making that risk high if he lived in a home with young children. Finally, Emahiser testified that Todd's risk factors for reoffending included any kind of behavior around or with children, and he recommended that Todd's contact with children "be completely and utterly minimized" and always "supervised by someone who knows his offense history."

{¶ 21} We note that both Larson and Emahiser testified that there was no evidence that Todd had reoffended since 1991. We also acknowledge the experts' testimony that Todd's lack of a substance-abuse problem, his age, prior jail sentence, and long-term significant relationship lowered his risk of reoffending.[4]

---

4. Appellants' briefs, which focus in part on the assertion that Todd poses only a medium-low risk to reoffend based on his assessment, cite studies indicating that if a pedophile's first offense is against someone other than the offender's own children, the offender is less likely to reoffend against his

{¶ 22} However, despite those positive indications, the experts and others who testified remained very concerned that Todd would reoffend. In fact, after five years of working with Todd, Larson opined that he had not truly committed to avoid reoffending. To the contrary, she believed that he was repositioning himself for further access to victims.

{¶ 23} In part, Larson's concerns were based on Todd's refusal to recognize the danger of contact with minors in light of his pedophilia and his insistence on being around children. Lawson testified that Todd routinely spent time at his sister's daycare center while he was on probation and that he had developed a telephone relationship with an 11–year–old girl there.

{¶ 24} Although there was no evidence that the 11–year–old girl was abused, the situation troubled the girl's family as well as Larson, who saw Todd's unsupervised contact with the girl as a sign of his unwillingness to reduce his risk of reoffending by modifying his behavior. Larson expressed concern that Todd may have been "grooming" the minor to become his victim, i.e., that he was planning and preparing her for sexual abuse.

{¶ 25} Larson also testified that she was very concerned that while Todd was undergoing therapy, he married Sarah, whose son, J.E., was the same age as the children Todd had been convicted of molesting and was autistic. Larson felt that Todd had entered into a high-risk situation by becoming involved with J.E. and Sarah, and that marrying Sarah was a very high-risk choice.[5] Larson further testified that she believed that Todd had engaged in grooming and planning by moving into the house in which J.E. lived. One of Todd's probation officers expressed similar concerns about Todd's developing association with J.E., which was described as "a high risk situation" involving a "target aged child of his preference."

{¶ 26} At the permanent-custody hearing, the efficacy of Todd's relapse-prevention plan was questioned. The GAL attempted to talk to the five people, other than Sarah, that Todd had chosen to support his relapse-prevention efforts. Two of those people had moved and could not be found; the remaining three had inadequate knowledge of Todd's past offenses and of his triggers for offending. One support person had no copy of the relapse-prevention plan and did not know Todd's triggers; another said that Todd had never really explained his sex offenses, that he had no idea what Todd's triggers are, and that Todd "is a very

own children, and also cite other studies for additional arguments in their favor. Those studies, however, were not presented to the juvenile court and are not part of the record before us. Because they played no role in the juvenile court's decision, the studies have no relevance to our resolution of this appeal, regardless of their reliability or authoritativeness.

5. Todd and Sarah met "over the Internet." They married while he was still on probation.

private person and doesn't really say much to me." Moreover, the GAL expressed that he was very concerned about the ability of the two primary support people, Sarah and Todd's mother, to protect the children.

{¶ 27} Emahiser testified that Sarah, who was Todd's primary support person for his relapse-prevention plan, did not fulfill her role very well because she did not understand relapse prevention and she failed to sufficiently appreciate her responsibilities for supporting Todd and protecting the children. Sarah at one point appeared to have an understanding of the important role she played in Todd's relapse-prevention plan, and it was determined that she had successfully completed her individual counseling. Less than two months after that determination had been made, however, Emahiser became very concerned when Sarah showed a complete inability to identify the information she previously had appeared to understand. Sarah then returned for additional therapy sessions after which she developed, "at minimum, rote memorization of the concepts." Emahiser was concerned that Sarah would not be able to identify inappropriate situations.

{¶ 28} Emahiser testified that Sarah initially did not think that the incident with Todd having K.H. straddle his lap was a problem but that Sarah later expressed to him that "it didn't look very good." Emahiser was very concerned that Sarah failed to appreciate the impropriety of the incident when it occurred; he stated that LCCS was not blowing the incident "out of proportion," because it was definitely inappropriate and a high-risk factor.

{¶ 29} There was testimony that sex offenders are inordinately deceptive and tend to resist treatment; thus, there was a need for constant and vigilant monitoring by people who were aware of Todd's risk factors and his past behavior of "grooming." According to the experts at the hearing, a pedophile should not have unsupervised contact with children even for limited time periods, such as when another adult leaves the room to use the bathroom. If Todd was reunited with the children, he could not attend any of their school activities, such as dance classes or soccer games, because those types of activities entailed too much risk.

{¶ 30} Emahiser opined that it is "extremely difficult" for a mother to constantly supervise two children when the offender lives in the house. "[I]t really puts a strain on the significant other to be everywhere all at once." Although additional home-based therapy was available if reunification of the family occurred, and safety measures, such as placing locks on doors or alarms in the house to reduce the risk of Todd being alone with the children, might have been implemented, testimony raised considerable doubt about appellants' commitment to using such safety devices.

{¶ 31} The evidence also indicated that while Sarah was more assertive when she was out of Todd's presence, he dominated the relationship and she was

subservient whenever she was with Todd. Sarah's personality was guarded; she waited for Todd to set the tone before responding to questions. Todd exerted considerable control over Sarah. The GAL concluded that Sarah was not able to step forward to protect her children and that she was "much too laid back" for his comfort.

{¶ 32} Todd was described as defensive and apt to minimize his history as a sexual offender. The GAL testified that Todd felt strongly that he had successfully completed SOT while on probation and that he was very emotional about that fact, becoming angry and frustrated when confronted with the suggestion that the therapy was not successful. Todd was described as likely to use manipulative or controlling behavior, to tell a story in half-truths, and to misinterpret events and conversations.

{¶ 33} There was also evidence that Todd and Sarah discussed the notion of separating in order for Sarah to regain custody of the children. They admitted, however, that they intended to use any separation as a temporary arrangement "to get the children back."

{¶ 34} The GAL testified that he believed that Todd loved his children and that Todd was "caught" in a difficult situation, but that Todd had never "bought and owned the issues" regarding his sexual-abuse history. The GAL did not believe that Todd had changed to make sure that the people around him were safe. The GAL also acknowledged that there was clearly a bond between K.H. and Sarah but stated that his major concern was appellants' inability to protect the children from possible sexual abuse. The GAL stated that no alternative placement had ever been proposed and expressed regret that the children should be separated from their parents, but he saw no good way for the children to be safe in the home when the parents had made it clear that they would not separate. The GAL viewed permanent custody to LCCS as "the unfortunate only option."[6]

{¶ 35} The juvenile court found that there was clear and convincing evidence that permanent custody should be awarded to LCCS and that appellants' parental rights should be terminated. The court found that the permanent-custody award was in the best interest of the children. The court determined that the children could not or should not be placed with a parent within a reasonable time because clear and convincing evidence supported findings under R.C. 2151.414(E)(1), (2), (4), (14), and (16) as to Todd, and R.C. 2151.414(E)(1), (4), (14), and (16) as to Sarah.

---

6. After LCCS's witnesses testified, Todd moved for a finding that LCCS had not established its case by clear and convincing evidence. The juvenile court denied Todd's motion, and appellants rested without presenting any witness testimony or additional evidence. The GAL then testified regarding his recommendation that LCCS's motion for permanent custody should be granted.

{¶ 36} The juvenile court stated that "the father's relapse prevention plan is flawed; * * * there is shallow empathy shown in the development of the plan, and the support persons chosen to guard against relapse are inadequate. The Court * * * is especially mindful of testimony of the professionals who worked, especially, with [Todd]. The Court also has considered the fact that [Todd and Sarah] have chosen to remain together as a couple and advocate for return of the children to a home they will maintain together. The Court finds that this would not be a safe environment for these children and specifically finds that the reasons for removal cannot be remedied when one of the parents is diagnosed with sexual offending behaviors such as [Todd] exhibits, which diagnoses include that of sexual predator."

{¶ 37} The Sixth District Court of Appeals affirmed the juvenile court's judgment. The appellate court disagreed with some of the trial court's findings under R.C. 2151.414(E) but held that clear and convincing evidence supported the finding under R.C. 2151.414(E)(2) that Todd's mental illness was so severe that he was "unable to provide an adequate permanent home" at the time of or within one year after the hearing. 175 Ohio App.3d 192, 2007-Ohio-6128, 886 N.E.2d 235, ¶ 47. The appellate court also held that the finding under R.C. 2151.414(E)(14) as to Sarah was supported by clear and convincing evidence because she was "unwilling to prevent her children from suffering sexual abuse by continuing to cohabit with a pedophile." Id. at ¶ 54. The court of appeals also affirmed the juvenile court's determination that the termination of parental rights was in the children's best interest. Id. at ¶ 61.

{¶ 38} We asserted discretionary jurisdiction, 117 Ohio St.3d 1405, 2008-Ohio-565, 881 N.E.2d 273, over a single proposition of law: "A diagnosis of pedophilia by a natural parent of minor children, and the refusal by the other natural parent to divorce or permanently separate from the parent so diagnosed, is insufficient to justify permanent termination of parental rights to those children where there is no finding that the offending parent has ever offended against his children and where the only instance of criminal activity occurred many years before the termination of parental rights."

ANALYSIS

{¶ 39} We recognize the fundamental right at issue in this case. In *Troxel v. Granville* (2000), 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49, the United States Supreme Court described the interest of parents in the care, custody, and control of their children as one of the oldest of the fundamental liberty interests recognized in American law. We also recognize that there is an essential and basic civil right to conceive and raise children. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 9; *Meyer v. Nebraska* (1923), 262 U.S. 390,

399, 43 S.Ct. 625, 67 L.Ed. 1042; *Skinner v. Oklahoma* (1942), 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655.

{¶ 40} Despite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169; *In re Perales* (1977), 52 Ohio St.2d 89, 97, 6 O.O.3d 293, 369 N.E.2d 1047; *Clark v. Bayer* (1877), 32 Ohio St. 299, 310, it is equally well settled that "[t]he fundamental interest of parents is not absolute," *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, at ¶ 11. The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so.

{¶ 41} The state's power to terminate parental rights is circumscribed, see *In re Cunningham* (1979), 59 Ohio St.2d 100, 105, 13 O.O.3d 78, 391 N.E.2d 1034 (termination of parental rights should be a "last resort"), but when that authority is properly invoked, it is fully proper and constitutional to remove children from their parents' care. "[S]uch an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." Id., quoting R.C. 2151.01(A).

{¶ 42} In Ohio, the termination of parental rights is governed by R.C. 2151.414. R.C. 2151.414(B)(1) requires a court to determine, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," and that certain other conditions apply. This court has defined clear and convincing evidence as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

{¶ 43} Here, the critical inquiry is threefold: Did the courts properly consider Todd's pedophilia pursuant to R.C. 2151.414(E)(2); did the courts properly consider Sarah's ability to protect the children in light of Todd's pedophilia pursuant to R.C. 2151.414(E)(14); and was the termination of parental rights in the children's best interest? As argued by appellants, the essential overall question is whether the juvenile court's findings of Todd's and Sarah's parental unfitness were supported by clear and convincing evidence.

{¶ 44} Under R.C. 2151.414(E)(2), a court must determine whether chronic mental illness of the parent "is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year" after the hearing on permanent custody. Appel-

lants do not dispute that pedophilia is a "chronic mental illness" for purposes of this statute, and we therefore need not discuss that point.

{¶ 45} We determine upon a thorough review of the record that clear and convincing evidence supports the juvenile court's finding that Todd's risk of reoffending was unacceptably high, and that he was therefore unable to provide an adequate permanent home for the children. The record contains unrefuted testimony that Todd did make some progress in his therapy, but he failed to achieve that level of progress necessary to reasonably ensure the safety of his children or for reunification to occur. Specifically, although Todd "successfully" completed years of court-ordered SOT, multiple witnesses, including experts in SOT, expressed serious doubts as to how "successful" the SOT actually was. Furthermore, extensive testimony established that Todd failed to make the necessary commitment to adequately minimize his risk of reoffending, allowing the degree of risk to the children to remain unacceptably high.

{¶ 46} Finally, we observe that although appellants make much of Emahiser's testimony that a standard assessment test rated Todd as a medium-low risk to reoffend, Emahiser also testified that if Todd lives in a home with young children, his risk of reoffending becomes high. Larson similarly opined that Todd was an extremely high risk to reoffend. Thus, even the sparse evidence that appellants rely upon to argue that Todd's risk to the children was minimal is far from compelling.

{¶ 47} We likewise determine that the juvenile court's decision to terminate Sarah's parental rights is supported by clear and convincing evidence. Under R.C. 2151.414(E)(14), we must look to whether "[t]he parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." Todd's propensities, his diagnosis of pedophilia, and his lack of significant progress in therapy are also important considerations in the analysis of Sarah's rights. In light of Todd's pedophilia, Sarah's role in the couple's relationship with the children was vital. However, the record contains extensive documentation that Sarah is not capable of adequately fulfilling her role as Todd's primary support person and that she therefore cannot ensure that the children will be protected from Todd's pedophilia and the possibility of his reoffending.

{¶ 48} Under the best of circumstances, it would be extremely difficult for anyone in Sarah's position to provide the necessary support. Indeed, a near-Herculean effort is required from a spouse responsible for monitoring and supporting a relapse-prevention plan in this situation. The record is replete with references to Sarah's inability to shoulder that burden and the circumstances

here fall well short of being in her favor. Based on the evidence, reunification would not be in the children's best interests.

{¶ 49} Although there are some outward similarities between the situation in this case and that in *In re D.A.*, there are also a number of significant differences. In *In re D.A.*, this court reversed a judgment that terminated the parental rights of a mentally retarded couple, holding that in a permanent-custody hearing, a trial court may not determine a child's best interest based "solely on the limited cognitive abilities of the parents." 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, syllabus. In so holding, we found that the record lacked evidence of any harm or threat of harm to the child and that the trial court's "sole reason for the termination of parental rights" was the low cognitive abilities of the parents. Id. at ¶ 38.

{¶ 50} In contrast, the record in this case contains specific clear and convincing evidence of a threat of harm to the children. Although appellants' proposition of law asserts that their parental rights were terminated solely because of Todd's diagnosis of pedophilia and the refusal of Sarah to separate from him, the record belies that assertion, and thus *In re D.A.* has little application to this case.

{¶ 51} Moreover, unlike the cognitive limitation of mental retardation at issue in *In re D.A.*, this case presents a unique condition—pedophilia—that by its very nature necessarily poses a danger to children. Because of that essential fact, courts addressing the custody of children must pay particular attention to the unique dangers pedophilia poses.

{¶ 52} Although other courts have addressed whether a parent's diagnosis of pedophilia or sex-offender status alone can form the basis for restricting or terminating parental rights, see, e.g., *State v. Coreau* (Me.1994), 651 A.2d 319; *In re L.M.* (2001), 319 Ill.App.3d 865, 254 Ill.Dec. 400, 747 N.E.2d 440; *State ex rel. State Office for Services to Children & Families v. Burke* (1999), 164 Or.App. 178, 990 P.2d 922, we need not specifically reach that issue on this record.

{¶ 53} Appellants' suggestion within their proposition of law that their rights were improperly terminated solely because of Todd's pedophilia is not supported by the record. This case is not about whether a diagnosis of pedophilia, standing alone, is a proper reason to terminate parental rights.[7] To the contrary, the record demonstrates that many other factors went into the determination, including the nature and quality of Todd's progress in therapy to treat his pedophilia, his behavior with K.H. and another young girl, the inadequacies of his

---

7. To be sure, reunification of a pedophile parent with his family is fraught with inherent peril. But in this case, although the experts testified that familial reunification is difficult to achieve when a parent is a pedophile, they never testified that is impossible per se for a pedophile to reintegrate successfully with his family; Todd's pedophilia was not the basis of the juvenile court's decision.

relapse-prevention plan, and Sarah's questionable ability to protect the children if Todd relapsed.

{¶ 54} Nor is this case about Sarah's right to marry, and remain married to, Todd. Although she has a constitutional right to remain married to a pedophile who has not made meaningful progress in therapy, that right does not ensure that her right to custody of her children is absolute. The state has the right to intervene when the exercise of her rights presents a safety or health hazard to her children. See, e.g., *In re Cunningham*, 59 Ohio St.2d at 106, 13 O.O.3d 78, 391 N.E.2d 1034, quoting *In re R.J.C.* (Fla.App.1974), 300 So.2d 54, 58 (" 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed' "); *In re L.S.*, Summit App. No. 23523, 2007-Ohio-1583, 2007 WL 987024, ¶ 19–20 (mother's fundamental rights to have custody of child and to marry are not absolute, but must yield when outweighed by the interests of the state in protecting the child).

{¶ 55} The court of appeals discussed a perceived lack of evidence in the record that LCCS ever presented Sarah with an ultimatum that she needed to separate from Todd and maintain a separate household to regain custody of her children. See 175 Ohio App.3d 192, 2007-Ohio-6128, 886 N.E.2d 235, ¶ 55–58. However, the record conclusively establishes that even if Sarah had separated from Todd and the couple had established separate living arrangements, they were unwilling to remain apart for any significant duration. As detailed above, the GAL's report stated that both Todd and Sarah had admitted that a separation would be only a temporary arrangement "to get the children back." The GAL testified that the couple saw separation as a tool to achieve reunification and that they anticipated that Todd would move back into the home shortly after LCCS closed the case. The GAL told the couple that separation merely to regain custody would not work. In addition, a caseworker testified that although Sarah and Todd "offered" to separate to reunite with the children and to resolve the case against them, the couple indicated that they did not intend to remain separated. The caseworker also testified that a temporary separation would not be effective and would not protect the children. In light of this unrefuted evidence and Sarah's documented shortcomings in her role in Todd's relapse-prevention plan, no inherently unfair treatment occurred that impaired Sarah's rights.

## CONCLUSION

{¶ 56} Our decision in this case is based not upon the diagnosis of pedophilia, but on the lack of successful therapy and the concerns that appellants would not be able to implement Todd's relapse-prevention plan. We hold that the juvenile court's decision that it was in the best interest of the children to terminate

appellants' parental rights was based on clear and convincing evidence. We affirm the judgment of the court of appeals.

Judgment affirmed.

Moyer, C.J., and Lundberg Stratton, O'Donnell, and Cupp, JJ., concur.

Lanzinger, J., concurs in judgment only.

Pfeifer, J., dissents.

---

### Lanzinger, J., concurring in judgment only.

{¶ 57} Although concurring in judgment, I wish to emphasize further that the majority's holding rests solely on the existence of clear and convincing evidence to terminate appellants' parental rights in this case. Nothing more.

{¶ 58} This opinion, with its detailed recitation of facts, does not directly address the proposition of law originally accepted for review. See majority opinion at ¶ 38. The majority acknowledges in its conclusion that it does not answer the question of whether a father's diagnosis of pedophilia or a mother's refusal to divorce or separate from her husband provides sufficient grounds for terminating parental rights.

{¶ 59} Decisions to separate children from their parents are among the most difficult and troubling choices the state must make. Accordingly, the particular facts and circumstances of one family's case will often provide minimal—if any— instructional value to those making decisions based upon another family's particular facts and circumstances. The decision of the court today neither expands nor strengthens the state's ability to separate a parent who has been diagnosed as a pedophile from his or her biological children; rather, it merely reaches a conclusion in one case based on one record.

{¶ 60} I respectfully concur in judgment only.

Lundberg Stratton, J., concurs in the foregoing opinion.

---

### Pfeifer, J., dissenting.

{¶ 61} I agree with Justice Lanzinger's concurring opinion that the majority opinion is so fact-specific that it has almost no ongoing vitality.

{¶ 62} The right of parents to custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville* (2000), 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. Furthermore, this fundamental liberty interest "does not evaporate simply because [parents] have not been model parents or have lost temporary custody of their child to the

State." *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. There is no question that Todd H. and Sarah H. have not been model parents; otherwise, their children would not be in the temporary custody of Lucas County Children Services. This court today prevents them from ever regaining custody because of Todd's prior pedophilia offense, even though the majority opinion states that "there was no evidence that Todd had reoffended since 1991." The majority opinion goes to great lengths to state that this court's decision is not based on Todd's condition but rather on the unacceptable risk that he will reoffend. It is a distinction without a difference.

{¶ 63} I realize that there is a risk that Todd will reoffend; I find that risk exceedingly troubling. But Todd has paid his debt to society for the crimes he pleaded guilty to, he has adhered to the terms of his probation, and he has submitted to sexual-offender treatment, though not as completely as his therapist or the members of this court, including me, would like. The bottom line is that Todd is losing a fundamental liberty interest, the custody of his children, because of something he might do, not because of something he has done. Even worse, Sarah is losing custody of her children permanently, not because of something she has done, but because of something Todd, her husband and the father of her children, might do. I dissent.

---

Thomas A. Sobecki, for appellants Sarah H. and Todd H.

Dianne L. Keeler, for appellee Lucas County Children Services.