[Cite as *In re KA.R.*, 2021-Ohio-4125.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE KA.R., ET AL. | : | |
| | : | No. 110504 |
| Minor Children | : | |
| | : | |
| [Appeal by L.R., Mother] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 18, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-19905459, AD-19905460, AD-19905461, and AD-19905462

### *Appearances:*

Sylvester Summers, Jr., Co., L.P.A. and Sylvester Summers, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

EMANUELLA D. GROVES, J.:

{¶ 1} Appellant-mother, L.R. ("Mother"), appeals from the judgment of the juvenile court awarding permanent custody of her children, Ke.R. (d.o.b. Mar. 24, 2008), Ka.R. (d.o.b. June 10, 2011), Ky.R. (d.o.b. July 30, 2014), and K.G. (d.o.b. Mar. 7, 2018), to the Cuyahoga County Department of Children and Family

Services ("CCDCFS" or "the agency").  For the reasons set forth below, we affirm the decision awarding permanent custody to the agency.

**Procedural History**

{¶ 2}  On May 3 and 6, 2019, respectively, CCDCFS filed a complaint and motion for predispositional temporary custody, alleging the minor children were neglected.  The complaint alleged that on April 19, 2019, Mother failed to supervise the children.  Mother left the children in the care of Ke.R., who was 11 years old at the time.  The complaint further alleged that, while unsupervised, one-year-old K.G. broke his arm and his leg.  Mother could not explain how he was injured.  Finally, the complaint alleged that Mother was overwhelmed with the care of the children.

{¶ 3}  On June 13, 2019, a hearing was held on CCDCFS's motion for predispositional temporary custody. Following the hearing, the juvenile court elected to place the children with two family friends, T.K. and P.D.  Mother's two oldest children would reside with T.K. and her two youngest with P.D.  The juvenile court's June 13, 2019 journal entry reflects that these placements were part of a "safety plan" that had been created for the children.[1]

{¶ 4}  On July 30, 2019, after an adjudicatory hearing, CCDCFS amended the complaint to allege that the children were dependent.  Mother stipulated to the

---

[1] The record reflects that there were several safety plan meetings; however, the plan is not detailed.  It is clear that the placement of the children with T.K. and P.D. was a product of these meetings, and they happened sometime after K.G. was injured, but it is not clear exactly when.

allegations in the amended complaint, and the juvenile court found the children to be dependent. The children continued in their safety plan placements.

{¶ 5} On August 20, 2019, after a dispositional hearing, the juvenile court granted CCDCFS's motion for emergency temporary custody and also committed the children to the temporary custody of CCDCFS. CCDCFS approved both T.K.'s and P.D.'s homes for foster placement, so the children remained in their placements at that time.

{¶ 6} On April 1, 2020, CCDCFS filed a motion for first extension of temporary custody. In the motion, CCDCFS alleged that Mother had completed parenting education and engaged in mental health treatment, but Mother still needed to demonstrate an ability to meet the children's basic needs and to engage in family counseling.

{¶ 7} On June 8, 2020, CCDCFS amended its motion from a request for extension of temporary custody to a motion for permanent custody to CCDCFS. In the supporting brief, CCDCFS stated that a case plan had been approved by the juvenile court, which required, among other things, that Mother follow through with the recommendations of her mental health assessment, complete family counseling, parenting education, and submit to a drug screen.

{¶ 8} CCDCFS stated that although Mother had completed parenting education, she failed to demonstrate that she benefitted from it. Further, Mother was inconsistent with taking her medication and going to counseling. The agency also stated Mother had failed to engage in family counseling and had failed to submit

to a drug screen. Mother was inconsistent in her visitation and communication with the children. CCDCFS also alleged that Mother did not acknowledge Ke.R.'s developmental delays. Finally, CCDCFS asserted that permanent custody was in the best interest of the children.

{¶ 9} On February 16, 2021, Mother filed a motion requesting weekly in-person visitation. Mother argued that to strengthen her bond with her children and meet case plan goals with regards to parenting, the then monthly virtual visitation schedule was insufficient. CCDCFS filed a motion opposing the request for weekly in-person visitation but suggested monthly in-person visits instead. The agency noted that although Mother had consistently visited between August 2020 and December 2020 when the agency arranged for in-person visits in her home, visits became inconsistent when the agency switched back to virtual visits due to an uptick in COVID-19 infections. CCDCFS indicated Mother did not attend visits. Furthermore, even after the agency switched visits to a different day at Mother's request, the agency alleged that Mother failed to attend visits.

{¶ 10} On March 22, 2021, Mother filed a motion to terminate temporary custody and grant legal custody to Mother. In the motion, Mother argued that she had completed all case plan goals, except family counseling. Mother alleged CCDCFS had not referred her for family counseling. In the alternative, Mother asked that custody be given to D.R., a family friend and former coworker of Mother, who had known the children all of their lives.

**Dispositional Hearing**

{¶ 11} At the dispositional hearing, CCDCFS presented the testimony of social worker, Arlethia Levison ("Levison"), who was assigned to Mother in March 2020. Levison testified that K.G.'s medical records indicated his broken bones were due to child abuse; however, they were unable to determine who injured him. Levison testified that Mother reported she was not home when the incident occurred. CCDCFS presented Mother with a case plan that addressed parenting, mental health, family counseling for Mother and Ke.R., and individual counseling for Ke.R. and Ka.R. In addition to the case plan, Mother was asked to submit to a drug screen and to participate in K.G.'s occupational and speech therapy.

{¶ 12} Levison testified that Mother participated in the mental health assessment and was diagnosed with depression and advised to seek mental health counseling. Mother had sporadic attendance with her first therapist and then stopped attending. After the agency filed for permanent custody, Mother asked to be transferred to MetroHealth. Mother reengaged in counseling in July 2020. Further, Mother felt therapy should focus on her anger issues and not the depression identified in her assessment.

{¶ 13} Levison testified that prior to being assigned the case in March 2020, Mother had not had any visits with the children. A semiannual review was conducted in April 2020, which Mother attended by phone. Levison felt Mother was inappropriately angry during that meeting. As Mother was not engaged in mental health counseling at that time, and due to Levison's concern that something else

might be going on, the agency asked Mother to submit to a drug screen. Mother did not comply. Levison met with Mother in May 2020 and started the process to begin visitation. Visits began in August 2020.

{¶ 14} Levison testified that Mother completed parenting education in 2019; however, Levison did not see Mother utilize what she learned during supervised visits. In-person visits occurred between August 2020 and December 2020. During those visits, Mother tended to favor K.G., and typically only spent time with two of the four children. Ke.R. would sit with Levison during visits. Mother had to be encouraged to engage Ke.R. but often did not seem to know how to engage with her despite receiving coaching. Mother also spent a large portion of visits calling relatives on her cell phone and having them speak to the children. The older children expressed frustration with this behavior as they often did not know these relatives and wanted to spend time with Mother.

{¶ 15} Levison testified that during visits, Mother did not set appropriate boundaries with K.G. Typically, if he cried, Mother would respond by doing whatever K.G. wanted. K.G. did not exhibit this type of needy behavior in the foster home.

{¶ 16} In October 2020, all four children were in the same foster placement with P.D. The two oldest children's foster placement with T.K. ended when T.K.'s mother became ill and T.K. became her mother's primary caregiver. Shortly after that, in November 2020, visits with Mother became virtual due to an uptick in COVID-19 infections. Mother was not consistent in attending those visits. Mother

did not attend any virtual visits in December, only one visit in January 2021, and no visits as of February 16, 2021, when Mother filed a motion asking for weekly in-person visitation.

{¶ 17} Levison was considering moving the visits back to where Mother lived; however, an allegation was raised that the home was unsanitary. The agency was involved because Mother was living with a girlfriend and the girlfriend's children. Those allegations were still under investigation at the time of the disciplinary hearing. The agency opposed weekly visits but supported monthly supervised in-home visits at that time.

{¶ 18} Levison testified that family counseling did not occur between Mother and Ke.R. because Ke.R. refused. Levison testified that typically the therapist would determine when it was best to include the parent in therapy. In Ke.R.'s case, Ke.R. was reluctant to talk about Mother in therapy or with Levison and would often shut down when anyone tried to talk to her about Mother or what it was like to live with Mother. To encourage the relationship between Mother and Ke.R., Levison encouraged Mother to engage Ke.R. during visits. Mother did not follow through. Levison described Ke.R. as "parentified," noting she was often called upon to take care of her three younger siblings and fill the role of a parent.

{¶ 19} Levison testified that Mother did not attend any of K.G.'s therapy sessions. K.G. was in therapy due to the injuries that led to agency involvement and removal of the children. Furthermore, K.G. had a locked jaw that presented a choking risk. CCDCFS wanted Mother to attend therapy to assist K.G. with these

issues.  Levison testified that Mother's failure to attend therapy demonstrated a failure to meet her child's basic needs.

{¶ 20} Levison testified that the children were well bonded and engaged with their foster mother, P.D.  Ka.R. and Ky.R. in particular were very connected to P.D., expressing a strong bond with P.D.  Ky.R. referred to P.D. as "Granny."

{¶ 21} On March 22, 2021, Mother filed for termination of temporary custody and/or legal custody to her friend and former coworker, D.R.  Levison testified that the agency investigated D.R. as a potential custodian for the children.

{¶ 22}  At the dispositional hearing, D.R. testified that he was in the process of being approved as a foster placement.  D.R. testified that he had known the children all their lives.  However, Levison testified that the children did not recognize his name when she asked them about D.R.

{¶ 23}  CCDCFS determined that disrupting the children's placement was unwarranted given their lack of a relationship with D.R. and their stability and bond with P.D.  The children remained in the care of P.D. during this time; however, as an alternative to permanent custody or custody with D.R., the agency investigated legal custody of the children with T.K. or P.D., the original safety plan placements. However, neither T.K. nor P.D. were willing to take formal legal custody, advocating instead for Mother to retain her ability to take custody of the children.  No other family members were identified as potential caregivers.

{¶ 24}  In a written report, filed April 16, 2021, the guardian ad litem, Pamela Hawkins ("GAL" or "Hawkins"), opined that permanent custody was in the best

interest of the children. In the report, Hawkins noted that although Mother had completed a parenting education program, she struggled to manage all four children together. Hawkins noted that Ke.R. refused to participate in counseling because she was angry with Mother and feared that she would be required to parent her siblings if they returned to Mother. Hawkins further noted that Ke.R. did not wish to return to her mother's custody and did not wish to talk with Mother on a consistent basis. Neither Ka.R. nor Ky.R. wanted to return to Mother's custody. Hawkins noted that Ka.R. is bonded with Mother but does not feel safe in her care. Ky.R. is also bonded with Mother. Hawkins suggested that Ky.R. may be following her sisters' lead when she says she does not want to return to Mother's care rather than expressing her feelings. K.G. was deemed too young to understand the proceedings in order to express an opinion on this issue.

{¶ 25} Hawkins noted that no relatives had filed for legal custody of the children. Further, none of the fathers or alleged fathers had engaged in any services to demonstrate that they could provide for the children on an ongoing basis. Further, Hawkins noted that Mother had not remedied the concerns that led to the children's removal; therefore, she did not recommend that the children be returned to her custody. Hawkins noted that the children's basic needs were being met in P.D.'s home and they were adjusting to their placement.

{¶ 26} At the conclusion of testimony, Hawkins gave an oral report in which she reiterated that permanent custody is in the best interest of the children. Hawkins also relayed that she had spoken to the children about D.R. and they did

not recognize the name, although Ke.R. thought she may have seen him one Christmas. Following the hearing, the juvenile court granted CCDCFS's motion for permanent custody of the children.

**{¶ 27}** Mother now appeals, assigning the following error for review:

### Assignment of Error
The Trial Court Erred In Awarding Permanent Custody to the CCDCFS As the CCDCFS Failed To Show By Clear And Convincing Evidence That Adequate Grounds Existed For A Grant of Permanent Custody And Therefore Such Decision Was Contrary To The Manifest Weight of the Evidence.

**{¶ 28}** "It is well established that a parent has a fundamental right to raise and care for his or her child." *In re AR.S.*, 8th Dist. Cuyahoga No. 110028, 2021-Ohio-1958, ¶ 27, citing *In re L.M.,* 8th Dist. Cuyahoga No. 106072, 2018-Ohio-963, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28; *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. Termination of parental rights has been described as "'the family law equivalent of the death penalty in a criminal case.'" *Id.*, quoting *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, citing *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14.

**{¶ 29}** "An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence." *Id.* at ¶ 28, citing *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "'Clear and convincing' evidence is that measure or degree

of proof that is more than a 'preponderance of the evidence,' but does not rise to the level of certainty required by the 'beyond a reasonable doubt' standard in criminal cases." *Id.* at ¶ 28, citing *In re K.S.*, 8th Dist. Cuyahoga No. 109928, 2021-Ohio-694, ¶ 15, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8, citing *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987). "'It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established."'" *Id.* at *id.*, quoting *In Re K.S.* at ¶15, quoting *In re M.S.* at ¶ 18.

**{¶ 30}** "The termination of parental rights is governed by R.C. 2151.414." *In re G.L.*, 8th Dist. Cuyahoga No. 110284, 2021-Ohio-2273, ¶ 37, citing *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. There is "a two-part test courts must apply when deciding whether to award permanent custody to a public children's services agency." *Id.*

**First Prong: R.C. 2151.414(B)(1)(a)-(e)**

**{¶ 31}** Under the first prong, the juvenile court must consider whether clear and convincing evidence established at least one of the following five factors:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed

with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 32} "Only one of the factors must be present for the first prong of the permanent custody analysis to be satisfied." *In re S.S.*, 8th Dist. Cuyahoga No. 109356, 2020-Ohio-3039, ¶ 28, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 33} In this instance, the juvenile court determined that subsection (d) was satisfied when it determined that

[t]he child[ren had] been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two-month period at the time of the permanent custody hearing.

{¶ 34} Mother is not disputing this finding, which is fully supported by the record. "[P]ermanent custody may be granted to an agency where R.C. 2151.414(B)(1)(d) is met and permanent custody is in the best interest of the child." *In re G.L.*, 8th Dist. Cuyahoga No. 110284, 2021-Ohio-2273, ¶ 40, citing *In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, 159 N.E.3d 241, ¶ 22.

{¶ 35} Because the juvenile court found that subsection (d) was satisfied, no further grounds were required to grant permanent custody. *Id.* at ¶ 41. However, the juvenile court also found that the children "cannot be placed with either of the child[ren]'s parents within a reasonable time or should not be placed with either parent," and made findings under R.C. 2151.414(E). The juvenile court found that despite reasonable case planning and diligent efforts by the agency following the removal of the children from the home, "the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the home."

{¶ 36} Mother argues that the juvenile court abused its discretion in finding that the children could not be returned to her within a reasonable time. Mother argues that the juvenile court had the discretion to extend temporary custody for an additional six months and that it was in the best interest of the children for the juvenile court to do so.

{¶ 37} Mother is correct that the juvenile court may extend temporary custody if it finds that extension is (1) in the best interest of the child, (2) significant progress has been made on the case plan, and (3) "there is reasonable cause to

believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension." R.C. 2151.415(D)(1).

{¶ 38} However, we disagree with Mother that an extension was warranted. In the instant case, the children had been in the custody of CCDCFS for 20 months and yet Mother had not completed case plan goals. Furthermore, the juvenile court found that, while three out of the four children had positive interactions with Mother, most did not wish to return to Mother's custody. Ke.R., the oldest child, had negative interactions with Mother and feared what would happen if she returned home to Mother. Ka.R. had positive interactions with Mother, but likewise was afraid of what would occur if she returned to Mother's care. The juvenile court further found that Mother continued to struggle with caring for all four children and noted that K.G. had special needs due to the incident that led to him being placed into custody.

{¶ 39} Here, Levison's testimony above established that although Mother completed parenting education, Mother never applied that knowledge in her interactions with the children; Mother only fully engaged in mental health counseling in July 2020 after the agency filed for permanent custody; Mother was the subject of an active investigation at the time of the permanent custody hearing; and Mother never attended any of K.G.'s therapy sessions to learn how to manage his special needs.

{¶ 40} Because Mother has not made appreciable strides toward the case plan's objectives, there is no dispute that the children cannot be placed with Mother

within a reasonable time. Given Mother's limited progress when the children had been in custody for 20 months, the juvenile court did not abuse its discretion in finding permanent custody was more appropriate than an extension of temporary custody. Our review of the records reveals that the juvenile court's findings under the first prong are supported by competent and credible evidence. Finding no error with the juvenile court's findings under the first prong, we consider the court's finding under the second prong.

## Second Prong: R.C. 2151.414 (D)

{¶ 41} The second prong requires the juvenile court to assess whether it has been established by clear and convincing evidence, that granting permanent custody to the agency is in the best interest of the child. We review a trial court's best-interest determination under R.C. 2151.414(D) for an abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. In this regard, "[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion." *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 60, citing *In re T.W.,* 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

{¶ 42} R.C. 2151.414(D)(1) sets forth best-interest factors that the court must consider when making the best-interest determination under R.C. 2151.414(D)(1), including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers, and any other person who may significantly affect the child;

(b)  The wishes of the child * * *;

(c)  The custodial history of the child, [**16]  including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 43}  The juvenile court has considerable discretion in weighing these factors. *In re D.A.* at *id.* "The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. "There is not one element that is given greater weight than the others pursuant to the statute." *Id.*

{¶ 44}  Mother does not dispute the juvenile court's best interest analysis, noting that it is "comprehensive."  Mother argues, however, that if given more time she could provide a more stable environment for her children.

{¶ 45}  In the journalized entry, the juvenile court found that

[t]he child's continued residence in or return to the home of mother, [L.R.] will be contrary to the child's best interest.

The Court further finds that reasonable efforts were made to prevent the removal of the child from his home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family and the reasons those services were not successful:  notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside of the home, the parent(s) failed continuously and repeatedly to substantially

remedy the conditions that caused the child to be placed outside the child's home.

{¶ 46} A review of the record supports the juvenile court's best-interest findings encapsulated above. The testimony established that R.C. 2151.414(D)(1)(a), the interaction and interrelationship of the children with their parents, siblings, relatives, and foster parents was considered. The children are in the same foster home with P.D. and are well bonded to her and each other. Under subsection (b), the three older children did not wish to be placed with Mother or D.R. The GAL, Hawkins, recommended permanent custody for all four children. Under subsection (c), the custodial history established that the children had been in the custody of CCDCFS for 12 or more months of a consecutive 22-month period.

{¶ 47} Under subsection (d), the need for a legally secure placement, the record established that the children had been in custody for 20 months without completion of the case plan. Further, the agency was not able to find relatives to take legal custody of the children. Finally, given Mother's lack of completion of the case plan, the children's need for a legally secure placement could best be achieved by granting permanent custody to CCDCFS. Under subsection (e), whether any of the factors in division R.C. 2151.414(E)(7) to (11) apply, we find that those sections are inapplicable to this case.

{¶ 48} Our review reflects that the best-interest factors that the juvenile court must consider under the second prong were contained in the record. We conclude the record contains competent, credible evidence from which the juvenile

court could have found the essential statutory elements for an award of permanent custody were established. The juvenile court's decision to grant permanent custody to CCDCFS and the termination of Mother's parental rights was not an abuse of discretion.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EMANUELLA D. GROVES, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MICHELLE J. SHEEHAN, J., CONCUR