[Cite as *In re T.A.H.*, 2017-Ohio-7143.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF : T.A.H. | JUDGES:<br>Hon. W. Scott Gwin, P.J.<br>Hon. William B. Hoffman, J.<br>Hon. Craig R. Baldwin, J.<br><br>Case No. 17CA11, 17CA12<br><br>O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Richland County Court of Common Pleas, Juvenile Division, Case No. 2012-DEP-00156 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | August 4, 2017 |
| APPEARANCES: | |

For Appellant/Father

DAVID WATSON
3 North Main St., Suite 702
Mansfield, Ohio 44902

For Appellee

SERENA M. COPPULA
Richland County Children Services Board
731 Scholl Road
Mansfield, Ohio 44907

For Appellant/Mother

JOHN C. O'DONNELL, III
10 West Newlon Place
Mansfield, Ohio 44902

*Hoffman, J.*

{¶1}   In Richland App. No. 2017 CA 011, Appellant Todd Hout ("Father") appeals the February 8, 2017 Opinion and Judgment Entry entered by the Richland County Court of Common Pleas, Juvenile Division, which terminated his parental rights, privileges, and responsibilities with respect to his minor child, and granted permanent custody of the child to Appellee Richland County Children Services Board ("RCCS"). In Richland App. No. 2017 CA 0012, Appellant Trisha Hout ("Mother") appeals the same with respect to the trial court's termination of her parental rights, privileges, and responsibilities.

STATEMENT OF THE CASE AND FACTS

{¶2}   Mother and Father are the biological parents of the child. Mother gave birth prematurely to the child on November 2, 2012. The child, who was unresponsive at birth, was in a medically fragile state and faced acute health and developmental issues.  Seven days after the child's birth on November 9, 2012, the trial court issued an ex parte order, placing the child into the emergency shelter care custody of RCCS.

{¶3}   The trial court found the child to be a dependent child at an adjudicatory hearing on January 29, 2013, and placed the child in the temporary custody of RCCS. On October 15, 2014, RCCS filed a motion for permanent custody. The trial court conducted a four day hearing.  Via Memorandum Opinion and Judgment Entry filed March 11, 2015, the trial court overruled the motion, finding Parents had not, at that point, been afforded "every procedural and substantive protection the law allows." The child remained in the temporary custody of RCCS.

**{¶4}** RCCS filed its second motion for permanent custody on April 20, 2016. The trial court conducted a four day hearing on the motion, commencing January 9, 2017. The parties stipulated the child had been in the temporary custody of RCCS for twelve or more months of a consecutive twenty-two month period, and had also been in the temporary custody of RCCS for two years or longer.

**{¶5}** The child was medically fragile at birth and faced acute health and developmental issues. Because of aspiration, a feeding tube was inserted into the child's stomach in the spring of 2013. Later that year, the child underwent a second surgery due to reflux. The child had severe dysphagia and significant delays in oral feeding. She also had significant fine motor, gross motor and developmental issues. She attended, and continues to attend, weekly occupational, physical, and speech therapy sessions. Her health had significantly improved over the course of the proceedings. Although the feeding tube remained, the child's swallowing ability had greatly improved and she did not use the feeding tube. Despite the improvements to her health, the child continues to need proactive, engaged, and competent caregiving.

**{¶6}** Since her birth, the child had had at least one hundred medical and/or hospital appointments, including 20 or more visits to Akron Children's Hospital. The foster parents transported the child to/from and attended all of the appointments. Parents regularly failed to attend the child's appointments, including routine well-child visits which occurred in Mansfield, Ohio, where they resided. Parents only attended approximately six appointments at Akron Children's Hospital notwithstanding regular notice and being provided transportation.

**{¶7}** The child suffers from asthma, which requires close monitoring and often requires an immediate medical response. Parents smoke, and neither have considered quitting even with the knowledge of the child's condition and the effect of smoking on her asthma. Overall, Parents did not show an interest or concern regarding the child's health and well-being.

**{¶8}** The case plan required Parents to attend parenting classes; complete psychological evaluations and follow all recommendations; maintain a clean and safe home; obtain stable sources of income; and attend the child's medical appointments.

**{¶9}** Parents attended cooking classes through Parent Aide. Parents also engaged in 20 parent educations sessions through Parent Aide. Laurie Daugherty, the parent educator, testified Parents needed more time to develop the nuances of parenting, which she believed to be a critical component to successful parenting. Daugherty observed Mother parenting without taking into consideration the child's developmental needs.

**{¶10}** During the four years the child was in the temporary custody of RCCS, Parents were afforded regular visitation, generally several times per week. The visits remained supervised throughout the case. RCCS workers used the visits to educate and train Parents to improve their basic parenting skills and to teach them how to meet the child's medical needs, including the proper use the feeding tube. Although Mother demonstrated a genuine emotional attachment to the child as well as limited nurturing abilities, at times, she did not respond to the child appropriately, demonstrating an incorrect or inadequate understanding of the child's needs. Mother did not always appropriately discipline the child. Father's interactions with the child were mainly passive

in nature. There was relatively little proactive interpersonal engagement with the child by Parents.

**{¶11}** The conditions of Parents' home was a concern throughout the proceedings. Parents struggled to consistently maintain a clean and safe home. RCCS workers observed bug infestation, including cockroaches, fleas, and bed bugs. The workers also noted strong odors of garbage, urine, and feces. The home was cluttered and dirty. At one point, the health department had to address the insect infestation. Episodes of bug infestation occurred periodically throughout the case.

**{¶12}** On September 15, 2013, Parents completed psychological evaluations at Northeast Ohio Behavioral Health. The results of the testing revealed Parents have cognitive deficits and mental health diagnoses which significantly impact their ability to effectively parent or otherwise adequately care for the child, especially in light of the child's ongoing medical needs. Father's IQ score placed him in the mild to moderate range of mental retardation. The evaluator opined the level of Father's intellectual ability will affect his reasoning, judgment, and ability to interpret situations. Father is likely to experience moderate difficulty with comprehending parenting instruction and integrating information. Further, Father's test results suggested he may have some degree of Bipolar Disorder. Mother has a below average IQ. The intellectual testing suggested Mother "is likely to encounter some difficulties understanding and retaining parenting instruction", and would require "a highly structured approach to parenting skill training, with active modeling and re-checking to ensure comprehension and transfer of learning." Like Father, Mother's intellectual ability will affect her reasoning, judgment, and ability to interpret situations.

{¶13} On May 18, 2015, Parents each completed a second psychological evaluation with Dr. Aaron Becker, a clinical psychologist. Dr. Becker, likewise, found Parents each have significant cognitive deficits. He opined Mother and Father would likely have difficulty parenting due to their cognitive deficits, and would need assistance to care for the child on a daily basis. Dr. Becker Father's IQ score was slightly higher on the test performed by Dr. Becker, however, Father still fell "at the extreme low end of the Borderline range of the population." Mother's IQ score was 60, which placed her in the extremely low range of the population. The test results showed Mother's adaptive behavior functioning, or social, skills, was extremely low. Further, the test results for self-care, leisure, functional academics, health and safety, and community use suggested Mother does not have the cognitive ability to adequately provide for her own personal hygiene and daily functioning, such as bathing and grooming; completing forms or applications; making a schedule; following safety rules; planning meals; and exchanging money accurately. Dr. Becker determined each parent to be "mildly mentally retarded."

{¶14} During the best interest portion of the hearing, the testimony revealed the child is very bonded with her foster parents, with whom she has lived for over four years. The child is fully assimilated into their family. The foster parents are fully committed to the child and attend to all of her needs – physical, emotional, and medical.

{¶15} The child has a relatively comfortable relationship with Parents. However, she had, on several occasions, resisted visiting Parents. Parents overall interpersonal relationship with the child was minimal and passive. The child resisted Mother's attempts to engage in a more active manner. The child's play therapist provided Parents with

techniques to utilize in their interactions with the child. Parents were less than willing to accept and apply those methods.

**{¶16}** Via Opinion and Judgment Entry filed February 8, 2017, the trial court terminated Father and Mother's parental rights, privileges, and responsibilities with respect to the child, and granted permanent custody of the child to RCCS. The trial court issued Findings of Fact and Conclusions of Law on the same day, which the trial court incorporated into its Judgment Entry.

**{¶17}** It is from this judgment entry Parents appeal.

**{¶18}** In Richland App. No. 17 CA 11, Father assigns the following as error:

I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO RICHLAND COUNTY CHILDREN SERVICES (RCCS) BECAUSE RCCS FAILED TO FILE A TIMELY ADOPTION CASE PLAN AS REQUIRED BY ORC 2151.413(E).

II. THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE CHILD'S BEST INTEREST THAT SHE BE PLACED IN THE PERMANENT CUSTODY OF RCCS AS THE AGENCY FAILED TO MEET ITS BURDEN OF PROF [SIC] AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE CHILD TO RCCS AS FATHER HAD SUBSTANTIALLY REMEDIED THE CONDITIONS THAT CAUSED THE CHILD'S REMOVAL.

IV. THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING PERMANENT CUSTODY OF THE CHILD TO RCCS WHEN THE AGENCY DID NOT USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS FOR REUNIFICATION WITH FATHER.

V. THE TRIAL COURT VIOLATED FATHER'S FUNDAMENTAL RIGHT TO RAISE HIS CHILD WHEN THE TRIAL COURT GRANTED PERMANENT CUSTODY TO RCCS.

**{¶19}** In Richland App. No. 17 CA 12, Mother raises the following assignments of error:

I. THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY TO CHILDREN SERVICES WAS CONTRARY TO LAW.

II. THE TRIAL COURT'S FINDINGS WAS [SIC] NOT BASED UPON CLEAR AND CONVINCING EVIDENCE.

**{¶20}** This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

FATHER

17 CA 11

I

**{¶21}** In his first assignment of error, Father argues the trial court erred in granting permanent custody of the child to RCCS as the Agency failed to file a timely adoption case plan as required by R.C. 2151.413(E).

**{¶22}** Father acknowledges the Ohio Supreme Court in *In re: T.R.,*120 Ohio St.3d 136, 2008-Ohio-5219, held, although R.C. 2151.413(E) "requires a children-services agency seeking permanent custody of a child to update the child's case plan to include adoption plans," the statute "does not require the agency to perform this action before the juvenile court rules on the motion for permanent custody." *Id.* at para. 8. However, Father refers this Court to Justice Lundberg Stratton's concurring opinion in *In re: T.R.*, in support of his position a public agency should include a plan for adoption in the child's case plan *prior to* the permanent custody hearing. (Emphasis added). Justice Lundberg Stratton noted her belief "the statutory scheme and the public policy underlying the 1997 federal amendments, in response to which Ohio amended its laws, support an inference that the General Assembly intended to require an agency to amend the child's case plan to include a specific plan for seeking adoption prior to the hearing on a motion for permanent custody." *Id.* at para. 18.

**{¶23}** Based upon the clear holding in *In re: T.R.*, we disagree with Father and find the trial court did not err in granting permanent custody of the child to RCCS before the Agency filed a case plan outlining the adoption plans.

**{¶24}** Father's first assignment of error is overruled.

FATHER

17 CA 11

II, III, V


MOTHER

17 CA 12

I, II


**{¶25}** We elect to address Father's second, third, and fifth assignments of error, and Mother's assignments of error together.

**{¶26}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279.

**{¶27}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶28} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶29} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶30} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C.

2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶31} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶32} Parents argue the trial court's decision to terminate their parental rights and grant permanent custody of their child to RCCS was based solely on their limited cognitive abilities, which the Ohio Supreme Court prohibited in *In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105.

{¶33} It is well established that a parent has a fundamental right to raise and care for his or her child. *In re C .F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, ¶ 28; *In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, ¶ 40. However, that right is not absolute. *In re K.H.* at ¶ 40. Government children's services agencies have broad authority to intervene when necessary for a child's welfare. *In re C.F.* at ¶ 28. "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re J.B.,* 8th Dist. Cuyahoga No. 98546, 2013–Ohio–1704, ¶ 66, quoting *In re Hitchcock* (1996), 120 Ohio App.3d 88, 102. When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.,* 8th Dist.

Cuyahoga No. 101390, 2015–Ohio–314, ¶ 67, citing *In re Howard* (Aug. 1, 1986), 5th Dist. Tuscarawas No. 85 A10–077, (Aug. 1, 1986). We recognize, however, that termination of parental rights is "the family law equivalent of the death penalty in a criminal case." *In re Hoffman,* 97 Ohio St.3d 92, 2002–Ohio–5368, ¶ 14

**{¶34}** In addressing this issue, the Ohio Supreme Court in *In re D.A.*, supra, held, "when determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents." *Id.* at para 36*.* The High Court reasoned:

The trial court stated that D.A.'s future could be 'seriously jeopardized' if he remained with his parents. But there was no evidence that they have harmed D.A. either physically, emotionally, or mentally. D.A. has done well in school, and his behavior is appropriate. At this point, it is speculation to say that he may not reach his full potential if he remains with his parents. * * *

We do not mean to minimize the trial court's concern about appellants' ability to parent their son. R.C. 2151.414, however, does not permit a parent's fundamental right to raise his or her child to be terminated based on mental retardation alone. In other cases in which the parental rights of mentally retarded persons have been terminated pursuant to R.C. 2151.414(E)(1) or (2), objective evidence existed to show that the statute was satisfied. See, e.g., *In re C.E.,* Butler App. Nos. CA2006–01–015 and CA2006–02–024, 2006–Ohio–4827, 2006 WL 2663464 (the mother needed

constant supervision and prompting to meet child's basic needs and had inadequate housing); *In re King,* Fairfield App. No. 05 CA 77, 2006–Ohio– 781, 2006 WL 401598 (the mother consistently relied on others to meet many of her basic needs and lost her housing). *Id.* at ¶ 36–37.

{¶35} In the present case, the trial court did not rely solely on Parents' cognitive abilities in granting permanent custody to RCCS. Rather, the evidence in this case illustrates a link between Parents' limited cognitive abilities and their abilities to remedy the problems identified by RCCS and to provide an adequate permanent home for the child. The evidence established Parents failed to regularly attend medical appointments for a child with extensive medical issues and failed to maintain a clean and appropriate home. They either did not comprehend the importance of their involvement in the child's medical care, or simply lacked motivation to be involved. Father did not have his own source of income either through employment or through social security disability income. In addition, the evidence revealed the child is bonded with the foster family with whom she has lived since her birth.

{¶36} Assuming, arguendo, the trial court based its decision solely on Parents' limited cognitive abilities, we find such error does not require reversal of the permanent custody determination under the two-issue rule. The trial court found an alternate, independent ground for terminating parental rights, i.e., the child had been in the temporary custody of RCCS for twelve or more months of a consecutive twenty-two month period.

{¶37} Father's second, third, and fifth assignment of error are overruled.

**{¶38}** Mother's first and second assignments of error are overruled.

FATHER

17 CA 11

IV

**{¶39}** In his fourth assignment of error, Father contends the trial court erred in granting permanent custody to RCCS as the Agency failed to use reasonable efforts to reunite the child with him.

**{¶40}** Pursuant to R.C. 2151.419, the agency which removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts.

**{¶41}** RCCS implemented a comprehensive reunification plan to assist Father in remedying the problems which caused the child to be removed.

**{¶42}** When a trial court is considering whether the agency made reasonable efforts to prevent the removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. *In re Brewer* (Feb. 12, 1996), Belmont App. No. 94–B–28, 1996 WL 65939, at 3; *In re Davidson–Rush,* 5th Dist. No.2006 CA 00121, 2006–Ohio–4873 at ¶ 50. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

**{¶43}** We have reviewed the record, and find substantial evidence to establish Father did not make significant progress toward alleviating RCCS's core concerns for the child despite the Agency's reasonable efforts to reunify the family.

**{¶44}** Father's fourth assignment of error is overruled.

**{¶45}** The judgment of the Richland County Court of Common Pleas, Juvenile Division, is affirmed.

By: Hoffman, J.

Gwin, P.J.  and

Baldwin, J. concur