[Cite as *In re L.M.B.*, 2020-Ohio-2925.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: L.M.B. and M.A.B. | : | APPEAL NOS. C-200033 |
| | | C-200044 |
| | : | TRIAL NO. F17-1500X |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 13, 2020

*Roger W. Kirk*, for Appellant Father,

*Anzelmo Law* and *James A. Anzelmo*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patrick Stapp*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Elizabeth Stringer*, Assistant Public Defender, Guardian ad Litem for Appellee minor children.

**BERGERON, Judge.**

{¶1} In this parental termination case, we ultimately reject challenges to the juvenile court's decision to terminate parental rights. Clear and convincing evidence supported the best interest analysis conducted by the court, as evidence filled the record regarding hazards to the children, parental drug use, untreated mental health problems, and the like. For the reasons explained below, we accordingly affirm.

I.

{¶2} This case began with the Hamilton County Department of Job and Family Services's ("HCJFS") motion for an interim order of temporary custody of L.M.B. (eight years old) and M.A.B. (four years old) due primarily to Mother and Father continuing to live with the children in a house condemned by the board of health. The magistrate promptly granted HCJFS's request in June 2017. And within two months, in August 2017, both children were adjudicated neglected and dependent, which landed them in the temporary custody of HCJFS. During this time, both children resided with their maternal great aunt.

{¶3} As reunification efforts proceeded, concerns arose regarding the parents' substance abuse issues and domestic violence history, as well as Mother's mental health. To address these concerns, both parents were to submit random drug screens to HCJFS, complete domestic violence assessments (and follow any recommendations), engage in homemaker services and a parenting program, and participate in substance abuse treatment at Talbert House, as well as mental health treatment for Mother. While both parents completed their domestic violence services, their engagement with the remaining case plan services fell well short. Regarding the drug screens, Mother and Father completed only a handful of the drug screens scheduled for them, with each testing positive for cocaine on at

least one occasion (twice for Mother). Moreover, neither parent ever completed the parenting program at Beechacres, they declined to use homemaker services, and they neglected their substance abuse treatment, all of which prompted Talbert House to discharge both for inconsistent participation.

{¶4} Similarly, visits with the children suffered from unpredictability. Although Mother and Father more consistently attended weekly visits facilitated by the Family Nurturing Center ("FNC"), only missing between four or five visits within a six-month period, those facilitated by HCJFS proved much more erratic, with the parents disappearing from HCJFS's view for "a month to a month-and-a-half at a time." Moreover, stable housing continued to present problems for the parents. While Mother and Father sold their condemned home in August 2018, they nevertheless moved into another residence unfit for the children, the paternal grandmother's house. Her residence posed various dangers to the children, including no railings on the staircase and missing drywall. The parents assured HCJFS that they were on the cusp of moving out, having leased an apartment at another location, but further investigation revealed that promise to be false.

{¶5} Meanwhile, in February 2018, HCJFS removed L.M.B. and M.A.B. from the maternal great aunt's residence and placed both children with a foster family, where they remained until trial. A few months later, in September 2018, HCJFS moved for permanent custody of the children. Yet HCJFS was not the only party vying for custody of the children, as both the paternal grandmother and maternal grandmother filed for legal custody of L.M.B. and M.A.B. And in February 2019, a trial proceeded on the competing motions, extending over two days, with the magistrate entertaining testimony from the various interests represented. On the one hand, the magistrate heard from two of HCJFS's

3

caseworkers and the guardian ad litem ("GAL") for the children, who recommended that HCJFS receive permanent custody of L.M.B. and M.A.B. based on Mother's and Father's failure to establish stable and safe housing, countless missed drug screens, and consistent neglect of their substance abuse treatment and case plan services, as well as the children's bond with their current foster family. On the other hand, Mother and Father maintained that the best interests of the children would be served by returning them to their parents, emphasizing their consistent visits with the children, their strong bond with them, and their ability to remedy the safety issues at their current residence. Finally, both grandmothers invited the magistrate to grant them legal custody of the children (but neither appealed the permanent custody decision, and thus we need not ponder on their arguments), with the *In re Williams* attorney for L.M.B. rallying in the maternal grandmother's corner.

{¶6} Ultimately, after considering all the evidence, the magistrate agreed with HCJFS's and the GAL's recommendation, granting HCJFS permanent custody of L.M.B. and M.A.B., thereby denying both grandmothers' motions seeking legal custody of the children. In the wake of this ruling, Mother, Father, and the *In re Williams* attorney lodged objections to the magistrate's decision, yet the juvenile court ultimately upheld the decision granting permanent custody to HCJFS. Mother and Father now appeal this order terminating their parental rights, asserting that the juvenile court erred in granting permanent custody to HCJFS.

II.

{¶7} Because Mother's and Father's assignments of error coincide, we address them together. In her first assignment of error, Mother challenges the court's finding under R.C. 2151.414(B)(1)(d), asserting clear and convincing evidence did not support that the

4

children resided in the care of HCJFS for 12 months or more of a consecutive 22-month period. In her second and Father's first assignment of error, both contend clear and convincing evidence did not support that permanent custody was in the best interests of the children. Father tacks on the additional challenge that the juvenile court's grant of permanent custody runs counter to the manifest weight of the evidence.

A.

{¶8} Reviewing a juvenile court's grant of permanent custody requires that we independently find that clear and convincing evidence supports the decision. *See In re C Children,* 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, ¶ 8 ("When reviewing a juvenile court's grant of permanent custody, we must independently find that clear and convincing evidence supports the decision."); *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. To satisfy the clear and convincing standard, the evidence must " 'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. As to Father's challenge to the manifest weight, we must evaluate whether the juvenile court lost its way in resolving conflicts in the evidence, which in turn caused a manifest miscarriage of justice. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16. In reviewing both Mother's and Father's sufficiency challenges, however, we scrutinize the record to determine whether the juvenile court had sufficient evidence to satisfy the clear and convincing standard. *Id.* at ¶ 15.

{¶9} As always, R.C. 2151.414 supplies the statutory framework for our journey. Pursuant to R.C. 2151.414, the court will only grant permanent custody if it finds by clear and convincing evidence that (1) one of the conditions enumerated in R.C. 2151.414(B)(1)(a) through (e) exists, and (2) granting permanent custody to the agency is in the best interests of the children. *See In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, ¶ 34. The magistrate and juvenile court here elected to utilize R.C. 2151.414(B)(1)(d), the so-called "12 of 22" factor, requiring that the children reside "in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period[.]"

{¶10} For purposes of calculating this time, R.C. 2151.413(D)(1) provides that this period runs from the earlier of the date that the court adjudicated the child abused, neglected, or dependent or 60 days after the date they were removed from the home. In this case, the earlier date for both L.M.B. and M.A.B. was 60 days after the date they were removed from the home, i.e., 60 days after June 22, 2017, when HCJFS received interim temporary custody. For both children, this date is August 21, 2017. Accordingly, at the time HCJFS moved for permanent custody on September 4, 2018, the children had resided in the temporary care of the agency for 12 months and 14 days, the months consecutive within a 22-month period.

{¶11} As best we can tell, Mother contends that the court erred in its 12 of 22 finding because the 22-month period did not run until after the permanent custody trial concluded. But, as indicated above, this represents a fundamental misunderstanding of the 12 of 22 factor, which necessitates only that the child reside in the temporary custody of HCJFS for 12 months or more (within a 22-month period) before it moves for permanent

6

custody. *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26 (holding that, because "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)," the 12 months must accrue before the agency can move for permanent custody). As long as the accrued 12 months fall within a consecutive 22-month period prior to HCJFS moving for permanent custody, the completion of this 22-month interval has no bearing on the 12 of 22 finding.

{¶12} The court also found R.C. 2151.414(B)(1)(a) applied, requiring a determination that the child cannot be placed within a reasonable time with either parent or should not be placed with either parent. However, we need not review this additional finding since "any" provision enumerated in R.C. 2151.414(B)(1) allows the court to proceed to the best interest inquiry, and the court's proper finding under R.C. 2151.414(B)(1)(d) satisfied that requirement. *See In re X.M.W. and E.A.W.*, 1st Dist. Hamilton Nos. C-190568 and C-190595, 2020-Ohio-449, ¶ 11 ("R.C. 2151.414(B)(1), however, only requires that 'any' of the (a) through (e) factors exist, rendering any finding under (B)(1)(a) superfluous in light of the R.C. 2151.414(B)(1)(d) conclusion."); *In re S.W.*, 3d Dist. Marion Nos. 9-18-29 and 9-18-30, 2019-Ohio-2068, ¶ 19, quoting *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14 (" '[T]he findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, [and] each is independently sufficient to use as a basis to grant the Agency's motion for permanent custody.' "). Therefore, clear and convincing evidence supported the court's finding that the children had resided in the temporary custody of HCJFS for 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). We accordingly overrule Mother's first assignment of error.

B.

**{¶13}** With the first prong satisfied, we now turn to the best interest inquiry. In determining whether permanent custody is in the best interests of the child, the court must consider all relevant factors within R.C. 2151.414(D)(1)(a) through (e). As always, no single factor holds greater weight or heightened significance, as the court must weigh them all in its analysis. *See In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35 ("No single factor is given greater weight or heightened significance.").

**{¶14}** Turning to the first factor, R.C. 2151.414(D)(1)(a) concerns "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who many significantly affect the child[.]" Mother and Father both maintain that the court failed to afford proper consideration of their strong bond with their children and their consistent visits, directing our attention to FNC facilitator Janet Van Nuland's testimony. At trial, Ms. Van Nuland described the parents' visits at FNC, noting that the parents engaged with the children and put their needs first, the children were always "very excited to see the parents" and appeared bonded to them, and she commented favorably on the parents' compliance and attendance. But the magistrate duly noted this point (and the juvenile court adopted the magistrate's findings). And, of course, there is another side to this story. Although the parents maintained consistent visits with their children during their time at FNC, this was not always the case, as one of the HCJFS caseworkers noted that when she facilitated the weekly visits between the parents and the children, "there would be a month to a month-and-a-half at a time that [she] wouldn't hear from either of them." And in fact, Mother acknowledged at trial that on occasion she missed visits with her children "because [she] relapsed."

{¶15} Further, the HCJFS caseworker testified that both L.M.B. and M.A.B. developed strong bonds with their foster family—living with this same foster family since February 2018 (i.e., for about a year before trial began). As the juvenile court explained, the girls are bonded with their foster family and thriving in their current foster home, both improving in school, L.M.B. participating in individual therapy, and the pair engaging in speech therapy at their schools. Further, the foster family consistently ensured that the children's needs were met, the girls attending all their medical appointments and receiving appropriate treatment. Notably, neither parent, at least at the time of trial, had ever requested involvement in any of the children's appointments.

{¶16} The juvenile court also properly considered the wishes of the children. *See* R.C. 2151.414(D)(1)(b) ("The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]"). As argued by the *In re Williams* attorney, eight-year-old L.M.B. wished to reside with her maternal grandmother. However, the GAL countered by recommending that HCJFS receive permanent custody of both children (four-year-old M.A.B. too young to express her wishes). In support of her best interest position, the GAL emphasized the parents' failure to establish stable and safe housing for the children and noncompliance with their substance abuse treatment.

{¶17} As discussed above, the juvenile court also appraised the children's custodial history, finding that the children were in the temporary custody of HCJFS for over 12 months of a consecutive 22-month period. *See* R.C. 2151.414(D)(1)(c). Further, at the conclusion of trial, the children had resided in HCJFS's temporary custody for nearly two years, most of that time with the same foster family.

{¶18} Moreover, the juvenile court concluded that a legally secure permanent placement of the children could only be achieved with a grant of permanent custody to HCJFS. *See* R.C. 2151.414(D)(1)(d) ("The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"). And clear and convincing evidence supported this finding in light of both the parents' ongoing substance abuse issues, noncompliance with case plan services and treatment programs, and failure to establish stable and safe housing for L.M.B. and M.A.B. Both parents had several opportunities to demonstrate progress in their case plans, but they fell regrettably short, neither successfully completing their ordered case plan services.

{¶19} Regarding their substance abuse, HCJFS required that Mother and Father complete random drug screens. Of the 20 plus drug screens scheduled for the pair, Mother and Father each completed roughly five, Father testing positive for cocaine on one occasion (that occasion being the last time he submitted a drug screen) and Mother testing positive for cocaine twice (one of those instances occurring about a month before trial commenced). Additionally, Mother never completed her substance abuse or mental health treatment, with Talbert House reporting Mother inconsistently attended her group and individual therapy appointments. Similarly, Talbert House discharged Father after just a couple of months for lack of communication and inconsistent visits with his group therapy. Substance abuse plagued both parents, with Father even admitting at trial he had a substance abuse problem (but he was not currently working on it). In similar fashion, Mother and Father did not complete their parenting program nor the recommended homemaker services to address

their housing issues. Although Father is correct that he completed the YMCA domestic violence prevention classes, this does not negate the myriad services that he failed to fulfill.

{¶20} Further, the parents never established a safe and secure home for the children to return to if reunited. *See In re S.F.*, 2d Dist. Montgomery No. 28606, 2020-Ohio-693, ¶ 62 (finding parents were not a legally secure placement since they could not "provide [the child] with secure, stable housing[.]"). As discussed above, HCJFS's involvement with the parents originated when, despite the board of health condemning their residence, the parents continued living there with the children. Further, while the parents throughout the case claimed they would obtain their own independent housing, their plans never came to fruition. In fact, the parents lied to their HCJFS caseworker concerning their plans to leave the paternal grandmother's home and rent an apartment.

{¶21} As to the last factor, R.C. 2151.414(D)(1)(e), the juvenile court properly found none of the factors listed in R.C. 2151.414(E)(7) through (11) applied to either parent. *See* R.C. 2151.414(D)(1)(e) ("Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.").

{¶22} We do not doubt the strong bond the parents share with their children here. Yet, this is but one out of many factors the court must weigh in determining the children's best interests. *See In re S.H.*, 12th Dist. Butler Nos. CA2014-12-259 and CA2015-01-008, 2015-Ohio-1763, ¶ 24 ("However, although a strong bond may very well exist, this is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding."). And as we demonstrated above, clear and convincing evidence supported the juvenile court's decision that permanent custody to HCJFS was in the children's best interest. Accordingly, we cannot find the court's decision was against the manifest weight or

lacked sufficient evidence. We therefore overrule Mother's second and Father's single assignment of error.

III.

{**¶23**} For the reasons set forth above, we overrule Mother's first and second assignments of error and Father's sole assignment of error. We accordingly affirm the judgment of the juvenile court.

Judgment affirmed.

**ZAYAS, P.J.**, and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.