**[Cite as *In re K.S.*, 2022-Ohio-14.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE:  K.S. | : | APPEAL NO. C-210479<br>TRIAL NO.   F13-1739X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  January 5, 2022

*Jeffrey J. Cutcher,* for Appellant Mother,

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Patrick Brinson*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Kimberly A. Helfrich*, Assistant Public Defender, for the Guardian Ad Litem for K.S.,

*Roberta Barbanel, In Re Williams* Attorney for K.S.

**CROUSE, Presiding Judge.**

{¶1}  Mother has appealed from the juvenile court's judgment granting permanent custody of K.S. to the Hamilton County Department of Job and Family Services ("HCJFS"). She argues in one assignment of error that the judgment was not supported by sufficient evidence. For the following reasons, we affirm the judgment of the juvenile court.

### *Factual Background*

{¶2}  K.S. was adjudicated dependent on October 21, 2015, and placed in the temporary custody of HCJFS on January 21, 2016. In December 2016, K.S. was placed with the maternal grandmother. Grandmother was granted legal custody on February 23, 2017. Grandmother indicated that she could no longer care for K.S., and on July 13, 2018, K.S. was again adjudicated dependent and placed in the temporary custody of HCJFS. HCJFS filed a motion to modify temporary custody to permanent custody on February 18, 2020. A trial was held on April 7, 2021, before the magistrate.

{¶3}  Teresa Berting testified that she is a mental-health therapist and specializes in treating adolescent children with post-traumatic stress disorder ("PTSD"). She treated K.S. for approximately a year and a half. K.S. has been diagnosed with PTSD, with dissociative symptoms. Berting testified that K.S. "disassociates" often, meaning her mind goes "somewhere else," and she "loses time" and can't recall what she has just done. At times K.S. behaves very childlike, even infantile. Other times she behaves like an adult and can be "very aggressive," including "cussing," "talking very sexualized," and "dancing very provocatively."

Berting testified that K.S. has made very little progress in therapy, but needs continual therapy and people around her who understand PTSD and disassociation.

{¶4} Katherine Denay Riggs is a consultant with Finding Hope Consulting and is a certified trauma specialist and resilience worker. She testified that she educates, trains, and coaches caregivers about conflicts and trauma and provided those services to K.S's caseworkers. She testified that she has observed destructive behaviors by K.S.—property destruction, elopement, and verbal and physical aggression. Riggs testified that her services were offered to mother, but mother only showed up to two sessions and was distracted and did not participate. At the time of trial, Riggs had been working on K.S.'s case for a year and two months. During her time on the case, K.S. has been to three different placements, and had "various hospitalizations."

{¶5} Megan Gray is K.S.'s HCJFS caseworker. Gray testified that she referred mother for family therapy and individual therapy, but mother's engagement with those services was sporadic. She testified that mother did successfully complete the "rescue family therapy." Gray testified that mother stopped attending her sessions with Riggs because mother thought they were "babying" K.S., and she did not find the sessions helpful. Gray testified that she did not believe that mother understood K.S.'s trauma history or therapy, and she believed that mother could not handle K.S's behavior. She testified that mother does not have custody of any of her children.

{¶6} Gray testified that mother has not visited K.S. consistently, and that her inconsistency negatively affects K.S.; when mother says she will visit and does not, K.S. becomes erratic. K.S. is currently in a group home specifically designed to

take care of her special needs. She is cared for by two caseworkers 24 hours a day, seven days a week, and there are no other children in the home because K.S. is unable to function in a family setting. Gray testified that K.S. needs such intensive care because she becomes aggressive and physical with staff and runs away from the home. Gray testified that the fact that K.S. has a therapeutic program designed specifically for her "says something about the kind of instruction [K.S.] needs to be successful." Gray testified that she does not believe that mother could provide that type of environment.

{¶7} Gray testified that K.S. is receiving a "significant" amount of services—individual therapy through Children's Home; the care of a medical doctor; services through "ANS," "ADS," and music therapy; and through Hope and Friends. Gray testified that she believed K.S. is benefitting from the services and continues to need them.

{¶8} Mother lives in Covington, Kentucky. Pursuant to the Interstate Compact for the Placement of Children ("ICPC"), HCJFS had to request that the Kentucky Cabinet for Health and Family Services ("Kentucky Cabinet") conduct an assessment of mother's suitability as a placement for K.S. before considering mother as a potential placement. *See* R.C. 5103.20 Art. V(A) and (D).

{¶9} The state introduced exhibit one, which it claimed was an ICPC report completed by the Kentucky Cabinet approximately a year before trial. Jermil Tarver, a supervisor at HCJFS, testified that the request for placement was denied by the Kentucky Cabinet because the Cabinet has custody of mother's other children, mother hasn't parented K.S. since 2014, and there are reports of domestic violence.

{¶10} Exhibit one summarized the Kentucky Cabinet's concerns with placing K.S. with mother. The report noted K.S.'s significant mental-health issues—she has been diagnosed with disruptive mood dysregulation disorder, reactive attachment disorder, bi-polar one disorder, oppositional defiant disorder and attention deficit hyperactive disorder, combined type. K.S. has frequent tantrums and meltdowns and runs away. She requires a full schedule to keep her busy. She has a temper and is verbally aggressive and destructive. Although mother has some insight into K.S.'s mental health, she minimizes the need for intense therapeutic services.

{¶11} According to the report, mother is difficult to reason with, challenges everything, and has failed to demonstrate the ability to manage K.S.'s behaviors. Mother has an "extensive history of domestic violence in each of her relationships," including the relationship with her current boyfriend, and has been the aggressor in some of the domestic-violence incidents. The report also noted concerns regarding physical abuse of K.S. when she was in grandmother's care.

{¶12} The report stated, "Currently [mother] has her other children in the home against ICPC regulations as she refused to give them back to [grandmother] who is the custodian of the children. [Mother] admitted to SSW that she said that if [grandmother] took the kids to her home she would kill [grandmother]." There are concerns over mother's unmet mental-health needs because she has been resistant to counseling. The report concluded that mother's home was not approved for placement.

{¶13} Mother testified that her inconsistency in visiting K.S. was due to the COVID-19 pandemic—the visits were outside and she missed some of the visits because it was too hot. K.S. was in care in Youngstown for nine months, and mother

did not visit K.S. during that time because she was pregnant and did not have a car. Mother testified that she did have phone calls and video visits with K.S. during that time.

{¶14} Mother testified that she saw her own therapist until her therapist told her that she had met her goals and there was nothing else he could provide for her. She testified that she would do whatever necessary to make sure K.S. gets the treatment she needs. Mother testified that she has seven children, but only had custody of one at the time of trial. Mother testified that she initially was unwilling to do supervised visits with K.S., but changed her mind and is now willing.

{¶15} The magistrate granted permanent custody to HCJFS. Mother filed objections to the magistrate's decision. After considering the parties' briefs, the juvenile court modified the magistrate's decision and adopted it as modified.

{¶16} Father has not appeared at any stage of the proceedings or visited or communicated with K.S. Grandmother did not participate in the trial or file objections to the magistrate's decision.

### *Sole Assignment of Error*

{¶17} In her sole assignment of error, mother contends that the termination of her parental rights and the grant of permanent custody were based upon insufficient evidence.

{¶18} Reviewing a juvenile court's grant of permanent custody requires that we independently find that clear and convincing evidence supports the decision. *In re L.M.B.*, 1st Dist. Hamilton Nos. C-200033 and C-200044, 2020-Ohio-2925, ¶ 8. Clear and convincing evidence produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538,

2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). In reviewing a sufficiency challenge, we scrutinize the record to determine whether the juvenile court had sufficient evidence on each element to satisfy the clear and convincing standard. *In re L.M.B.* at ¶ 8.

{¶19} When a child has been previously adjudicated abused, neglected, or dependent and temporary custody has been granted to HCJFS pursuant to R.C. 2151.353(A)(2), HCJFS may then move for permanent custody of the child pursuant to R.C. 2151.413(A) and 2151.414. *In re A.J.O.,* 1st Dist. Hamilton No. C-180680, 2019-Ohio-975, ¶ 7. The court will grant permanent custody to HCJFS if a two-prong test is satisfied. *See id.*; R.C. 2151.414(B).

{¶20} The first prong can be satisfied by any one of five conditions, including if the child has been in the custody of a children's services agency for at least 12 months of a consecutive 22-month period ("12 of 22" provision). R.C. 2151.414(B)(1)(d). Mother concedes that the 12-of-22 provision is satisfied.

{¶21} The second prong requires the court to find that it is in the best interest of the child to grant permanent custody to the agency. *See* R.C. 2151.414(B)(1).

{¶22} Pursuant to R.C. 2151.414(D)(1), the court may find that permanent custody is in the best interest of the child upon consideration of all relevant factors, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶23} Under R.C. 2151.414(D)(1)(a), the magistrate found that mother and grandmother have not consistently visited K.S., and K.S. has not lived with mother since 2015.

{¶24} Under R.C. 2151.414(D)(1)(b), the magistrate found that K.S. had expressed a desire to live with grandmother, but grandmother is not a party to the proceedings and has not consistently expressed a desire to reunify with K.S.

{¶25} Under R.C. 2151.414(D)(1)(c), the 12-of-22 condition is met. Also, HCJFS removed K.S. from mother's care in 2015 and she has been placed in several different homes since then. According to exhibit one, mother has not parented K.S. on her own since 2014.

{¶26} Under R.C. 2151.414(D)(1)(d), the magistrate found that "an award of permanent custody is the only disposition available to allow the agency to provide

the placement and services the child requires. Placement with mother or maternal grandmother is not an option."

{¶27} The magistrate found that none of the factors in R.C. 2151.414(D)(1)(e) were applicable.

{¶28} The juvenile court amended the magistrate's findings under R.C. 2151.414(D)(1)(d) and (e). Under (d), in addition to the magistrate's findings, the court found that grandmother was inconsistent in her desire to reunify with K.S., and, thus, she could not provide a legally secure permanent placement. The court also found, "[T]he ability to achieve a legally secure placement with Mother was a legal impossibility due to the denied ICPC." Under (e), the court found that father had abandoned K.S.

{¶29} Mother contends the juvenile court's finding regarding her inability to provide a legally secure permanent placement was based upon insufficient evidence. In support of her sufficiency argument, mother contends the magistrate erred in admitting exhibit one because the exhibit is not what the state purports it to be. Mother claims exhibit one is not a completed ICPC report, but rather an unsigned draft of a document titled "Safety Check and Review," which was completed on April 22, 2020, a year prior to trial. Mother also argues that the magistrate improperly relied on hearsay testimony from Gray that the ICPC report denied placement with mother. Mother does not assert these arguments as separate assignments of error supported by legal authority. Instead, she includes them in her challenge to the sufficiency of the evidence.

{¶30} With regard to the admission of exhibit one, mother's trial counsel stated, "no objection," when the state introduced it into evidence. "A negative

response on the record to a trial court's invitation to raise an objection results in waiver of the unraised objection." *State v. Armstead*, 1st Dist. Hamilton No. C-200417, 2021-Ohio-4000, ¶ 46; *accord State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, ¶ 16 (the court held that the state had waived its argument regarding the defendant's diminished-capacity defense where the state "had 'no objection' to Ireland's calling Dr. Reardon as an expert witness, affirmatively told the trial court that it was not requesting that the court strike Dr. Reardon's testimony, and agreed that there was 'no objection to anything on the standards.' "). Therefore, even if this issue had been raised as a separate assignment of error, we would not review the issue on appeal, even for plain error. *Armstead* at ¶ 48; *State v. Bradley*, 42 Ohio St.3d 136, 140, 538 N.E.2d 373 (1989) (refusing to review for plain error after finding that the defendant waived any error in the admission of an investigation report when his trial counsel, after ample time to reflect, consciously refused to object to the report's admission into evidence). Furthermore, our examination of exhibit one leads us to conclude that it clearly relates to what the state purported it to be—an assessment of mother's suitability as a placement for K.S.

{¶31} While mother did object to the hearsay testimony of Gray, she did not object to Tarver's testimony that the conclusion of exhibit one was to deny placement. Thus, any error relating to Gray's testimony was harmless because exhibit one and Tarver's testimony were admitted without objection and both demonstrated that the ability to achieve a legally secure placement with mother was a legal impossibility due to the Kentucky Cabinet's denial of placement.

{¶32} Under R.C. 2151.414(D)(1)(a), mother argues that her inconsistency in visitation was caused by the COVID-19 pandemic, which resulted in limited visitations that had to be conducted outside. Mother testified, "I did miss some of those visits because it would be like 90 degrees outside. It was just too hot to be outside in 90 degree weather." Mother also argues that the termination of parental rights will leave K.S. without a family, thus negatively impacting her mental state. Gray testified that K.S. is bonded with mother. There is no foster-parent bond to consider because K.S. is not in a foster home. There was no evidence presented of a bond between K.S. and her siblings.

{¶33} Gray and mother testified that her visitation attendance was inconsistent, and mother provided an unconvincing reason as to why. Gray testified that mother's inconsistency has had a negative effect on K.S. The magistrate and juvenile court had reasonable grounds to believe that mother's inconsistency in attending visitations negatively affected her bond with K.S. Thus, the R.C. 2151.414(D)(1)(a) findings were supported by sufficient evidence.

{¶34} Under R.C. 2151.414(D)(1)(d), mother argues K.S. has made very little progress in the care of HCJFS, and HCJFS did not prove that permanent custody was the only way to provide the treatment K.S. needs.

{¶35} Berting testified that K.S. has made very little progress in therapy, but made it clear that K.S. should continue to participate in therapy. Gray testified that K.S. requires 24-hour care from two caregivers and has a program designed specifically for her, which is unique and demonstrates the level of care that K.S. requires. Gray identified the many services that HCJFS arranges for K.S. Mother does not have the specialized training that K.S. requires and declined to receive that

type of training when she failed to show up for sessions with Riggs and was distracted and did not participate in the two sessions she did attend. Gray testified that mother's involvement in her case-plan services has been sporadic and that she does not believe mother can provide the environment that K.S. requires.

{¶36} Moreover, as illustrated in exhibit one, the Kentucky Cabinet denied placement with mother. R.C. 5103.20 codified the ICPC in Ohio.

> Under Article VI, Section B, when an Ohio agency requests that another state, the receiving state, perform a local assessment or home study, and the receiving state does not approve the placement, "*the child shall not be placed.*" There is no right to judicial review in Ohio, the sending state. But any "interested party" has a right to seek judicial review through procedures in the receiving state.

(Emphasis added.) (Citations omitted.) *In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 33.

{¶37} Therefore, the court could not place K.S. with mother. K.S. is in need of a legally secure permanent placement and that placement cannot be achieved without a grant of permanent custody to HCJFS. The best-interest findings are supported by sufficient evidence.

### *Conclusion*

{¶38} The sole assignment of error is overruled and the judgment of the trial court is affirmed.

Judgment affirmed.

**WINKLER** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.