[Cite as *In re D.S.*, 2022-Ohio-515.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| IN RE: D.S. | : | APPEAL NO. C-210579 |
| | | TRIAL NO. F17-1331-X |
| | : | |
| | : | *O P I N I O N.* |


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 24, 2022


*Jon R. Sinclair*, for Appellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney*, and *Daniel Monk,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Jeffrey A. McCormick*, *ProKids*, for Appellee Guardian ad Litem for D.S.

**CROUSE, Judge.**

{¶1}  Father has appealed the juvenile court's entry granting permanent custody of his child, D.S., to the Hamilton County Department of Job and Family Services ("HCJFS").  In one assignment of error, father argues that the juvenile court's finding that D.S. cannot not be placed with him within a reasonable time, or should not be placed with him was based on insufficient evidence and was against the manifest weight of the evidence.  *See* R.C. 2151.414(B)(1)(a).  For the reasons that follow, we overrule the assignment of error and affirm the judgment of the juvenile court.

### *Factual and Procedural Background*

{¶2}  D.S. was born on March 18, 2017, to mother and father. Mother died of a drug overdose while the case was pending. Father has also struggled with substance abuse. On June 29, 2017, D.S. was adjudicated abused, neglected, and dependent. Temporary custody was granted to HCJFS, and D.S. was placed in a foster home. Father completed the case plan and was granted legal custody on November 8, 2018. On December 2, 2019, interim custody was granted to D.S.'s paternal grandmother ("grandmother") after she raised concerns about D.S.'s safety when in father's care. Shortly thereafter, grandmother requested that D.S. be placed with his former foster parents for his own safety due to grandmother's concerns with father's erratic behavior. She testified:

> [H]is dad would show up at the house unannounced. Threatened to
> take [D.S], locked me out of my house. It was just a whole uproar for
> [D.S.]. [D.S.] would cry. He would spend a few minutes with [D.S.] and
> leave. At that time, he was living in his truck outside my home. Police

were called numerous times for him showing up just screaming and yelling at me. So, I reached out to the caseworker, and asked if his former foster parents would be open to taking [D.S.].

{¶3} In response to grandmother's concerns, interim custody was granted to HCJFS on August 6, 2020. HCJFS filed a complaint for permanent custody on the same day. On January 14, 2021, HCJFS filed a motion to dismiss its complaint, along with a new complaint due to statutory timeframes. The court granted interim custody to HCJFS on February 1, 2021. On March 15, 2021, again to due to statutory timeframes, HCJFS filed another motion to dismiss its complaint, along with a new complaint. D.S. was placed in the interim custody of HCJFS on the same day. D.S was adjudicated neglected and dependent on May 25, 2021. The magistrate granted permanent custody to HCJFS on June 10, 2021. On July 21, 2021, father filed a motion for leave to file out of time and objections to the magistrate's June 10, 2021 decision. On October 13, 2021, the court denied father's objections and adopted the magistrate's decision, finding "numerous [R.C. 2151.414(E)] factors exist, though only one is required to move on to a consideration of the best interest factors." The court found that the record "provide[s] a picture of the nature of father's behaviors that present a risk of harm to the child if in his care."

{¶4} Father now appeals, challenging only one part of the court's required two-part finding, and asks us to remand the cause with a disposition for temporary custody so he can pursue reunification.

### Law and Analysis

{¶5} On appeal, we must "independently find that clear and convincing evidence supports [the grant of permanent custody.]" *In re C. Children*, 1st Dist.

Hamilton No. C-190650, 2020-Ohio-946, ¶ 8, citing *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. This requires appellate courts to "examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the statutory clear-and-convincing standard." *In re W.W.* at ¶ 46. "Clear and convincing evidence produces 'in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.S.*, 1st Dist. Hamilton No. C-210479, 2022-Ohio-14, ¶ 18, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954).

{¶6} When we review for sufficiency of the evidence, "we scrutinize the record to determine whether the juvenile court had sufficient evidence on each element to satisfy the clear and convincing standard." *In re K.S.* at ¶ 18, citing *In re L.M.B.,* 1st Dist. Hamilton Nos. C-200033 and C-200044, 2020-Ohio-2925, ¶ 8.

{¶7} When we review for manifest weight of the evidence, we must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "whether the court lost its way in resolving conflicts in the evidence, which resulted in a manifest miscarriage of justice." *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, citing *In re A.B.*, 1st Dist. Hamilton No. C-150307, 2015-Ohio-3247, ¶ 16.

{¶8} In order for permanent custody to be granted, HCJFS must satisfy both parts of the two-part test found in R.C. 2151.414. First, the court must determine whether HCJFS has shown that one of the conditions of R.C. 2151.414(B)(1) is satisfied. Then, HCJFS must demonstrate that permanent custody is in the child's best interest. *See* R.C. 2151.414(D)(1). Father challenges only the

4

first part of the court's finding. As articulated by this court, the R.C. 2151.414(B)(1) conditions include:

> (1) "the child is abandoned"
>
> (2) "the child is orphaned, and there are no relatives of the child who are able to take permanent custody"
>
> (3) at the time the agency files the motion for permanent custody, "the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period;" * * * or
>
> (4) none of the preceding conditions apply and "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," based on an analysis under R.C. 2151.414(E).

*In re J.H.*, 1st Dist. Hamilton No. C-210441, 2021-Ohio-4005, quoting *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, at ¶ 49, quoting R.C. 2151.414(B)(1).  In this case, HCJFS sought to prove the fourth condition: that D.S. cannot be placed with father within a reasonable time, or should not be placed with father.

{¶9}    To make this determination, courts assess the factors in R.C. 2151.414(E).  A finding by clear and convincing evidence that even one of the factors exists is sufficient. *In re H.R.H.*, 1st Dist. Hamilton No. C-210071, 2020-Ohio-3160, ¶ 17; *In re William S.*, 75 Ohio St.3d 95, 99, 661 N.E.2d 738 (1996). These factors include, in relevant part:

(1) Following the placement of the child outside the child's home * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child * * * ;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(10) The parent has abandoned the child.

R.C. 2151.414(E)(1) – (16). The juvenile court found that R.C. 2151.414(E)(1), (2), (4) and (10) were satisfied, though only one is needed. *See In re H.R.H.* at ¶ 17.

{¶10} First, the court noted in its entry on the objections that father has been unwilling to participate in case-planning services, which prevented him from

6

remedying any of the conditions causing D.S. to be placed outside the home. R.C. 2151.414(E)(1). Father argues this is erroneous, and points out that there was no case plan filed until June 9, 2021—two days after the dispositional hearing, and one day before the magistrate granted permanent custody to HCJFS. While the record confirms this, Barry Drizin, father's caseworker, said in the dispositional hearing that a case plan was approved by HCJFS in March 2021, but apparently never filed because it was "under objections to the adjudication."

{¶11} Testimony suggests though that even if a plan was filed earlier, father would have continued to refuse any case-planning services. Drizin testified that, in regard to case-planning services, "we never actually got to a point where we were able to sit down and have that conversation," because father would not sign the release of information. The record contains extensive testimony from Drizin and HCJFS case-worker Sherese Lewis about father's repeated refusal to sign the release of information necessary to engage in case-planning services and to visit with D.S. Drizin testified that eventually, father blocked Drizin's number and refused to communicate with him at all, even after Drizin repeatedly explained the need to sign the release. Drizin testified that "[father] made it clear that I am not to have contact with him." At a preliminary hearing before the permanent-custody trial—the only hearing at which father appeared—when asked whether he thought "it might be a good idea to sign the release of information," father responded, "[n]o, I'm not gonna sign them." Father's documented refusal to sign the release of information prevented him from visiting D.S. and accessing case-plan services.

{¶12} Second, the court noted that father has "some mental health and substance abuse issues that remain outstanding." R.C. 2151.414(E)(2). Father argues

that there was no evidence of a particular mental-health diagnosis that would impact his parenting, though he does not dispute his substance-abuse history. Lewis testified that in November 2019, father was admitted to the University of Cincinnati Psychiatric Emergency Services for hallucinations, and tested positive for methamphetamines. David Goldey, father's probation officer, also testified that father tested positive for "amphetamines" on March 9, 2021. Grandmother testified that she had tried several times to get father into substance-abuse and mental-health treatment, but he refused. Grandmother also testified that father refused to follow the recommendations of psychiatric providers. Drizin testified about father's mental-health struggles as well, noting that after being charged with theft and trespassing in October 2020, he was transferred from the Hamilton County Justice Center to Summit Behavioral Health for competency restoration. Goldey also testified that father failed to participate in mental-health services as required by the mental-health court. Father did not introduce any evidence demonstrating that he was addressing either his mental-health or substance-abuse issues.

{¶**13**} Third, the court found father had not visited D.S. since September 2020. R.C. 2151.414(E)(4). This was largely due to father's refusal to sign the release of information. Drizin testified that father did not contact the agency "for an extended period of time," had not provided any financial support for D.S., and had not communicated with D.S. or the foster family. At a preliminary hearing, father demonstrated that he did not have a plan for housing if he were to get custody of D.S., stating, "I figured JFS would help with housing."

{¶**14**} Finally, the court found father had not contacted D.S. for more than nine months. R.C. 2151.414(E)(10). The testimony above demonstrates that father's

refusal to sign the release of information prevented him from contacting D.S., and that father was aware of this.

{¶15}  After a thorough review of the record, we find that the court's grant of permanent custody to HCJFS was based on clear and convincing evidence. Father does not dispute that permanent custody is in the child's best interest, and the record is replete with evidence that D.S. cannot be placed with father within a reasonable time, or should not be placed with father.

{¶16} The trial court had sufficient evidence to satisfy the clear-and-convincing standard in this case, and it did not lose its way in resolving conflicts in the evidence.  In light of the foregoing analysis, we overrule father's assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**BERGERON, P. J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.